672 A.2d 1154

GENERAL ACCIDENT INSURANCE CO. OF AMERICA, PLAIN-TIFF–APPELLANT, v. STATE OF NEW JERSEY, DEPART-MENT OF ENVIRONMENTAL PROTECTION AND JOHN DOE INSURANCE COMPANIES 1 THROUGH 20, DEFENDANTS, AND N.B. FAIRCLOUGH & SON, INC., DEFENDANT AND THIRD–PARTY PLAINTIFF–RESPONDENT, v. HARTFORD IN-SURANCE COMPANY, INTERSTATE FIRE INSURANCE COMPANY AND CHICAGO INSURANCE COMPANY; MISSION INSURANCE COMPANY; NATIONAL GRANGE MUTUAL IN-SURANCE COMPANY; NATIONAL UNION INSURANCE COM-PANY; NORTHBROOK INSURANCE COMPANY; RELIANCE INSURANCE COMPANY; AND SELECTIVE INSURANCE COMPANY, THIRD–PARTY DEFENDANTS.

Argued November 28, 1995—Decided March 26, 1996.

*Michael H. Cohen* argued the cause for appellant (*Morgan, Melhuish, Monaghan, Arvidson, Abrutyn & Lisowski,* attorneys).

*James P. Fox* argued the cause for respondent (*Morris, Downing & Sherred,* attorneys).

*Gerald A. Hughes* submitted a brief on behalf of *amicus curiae,* Insurance Environmental Litigation Association (*Hughes & Hendrix,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

"In the arena of environmental insurance law, it sometimes appears that just as soon as one issue of importance is resolved, like Hydra, the many-headed serpent in Greek mythology, at least two new issues arise to replace it." Jeffrey L. Fillerup & Dominic

S. Nesbitt, *The Duty to Defend: Post–Montrose Issues*, 718 *PLI/Comm.* 49 (PLI Commercial Law and Practice Course Handbook Series No. 4477, May–June 1995).

A new issue that has arisen is whether remedial studies conducted in connection with governmentally-mandated environmental cleanups are to be classified as indemnity payments or defense costs under a policy of comprehensive general liability (CGL) insurance. Ordinarily, liability insurance provisions differentiate clearly between a duty to pay on behalf of the policyholder sums that the insurance company is obligated contractually to pay as damages because of harms or losses covered by the insurance policy, and a duty to defend the policyholder against any claim for damages. Liability insurance policies usually provide that the insurance company shall have the right as well as the duty to conduct the defense on behalf of the policyholder.

A recent law review article summarizes the issues in this case. We cannot improve upon the presentation.

> The duty to defend under a CGL policy obligates the insurer to pay the fees of attorneys, investigators and expert consultants who prepare and assist in the defense of lawsuits filed against the policyholder. Depending upon the policy language, defense costs will either count towards the stated coverage limit of the policy or they will be exclusive of the limit. Under a cost-exclusive policy, the insurer's coverage obligation has the potential to be far greater than the stated indemnity limit. This is because defense costs in a cost-exclusive policy will not serve to impair the liability limit; only payments for damages in the form of judgments or settlements impair or exhaust the limits of a cost-exclusive policy.
>
> Defense costs under a cost-exclusive CGL policy can eclipse the stated policy limit where no settlements or judgments equaling the limit are sustained. This is quite different from a policy where defense costs count towards the limit. Any combination of settlements, judgments and defense costs which equals the stated coverage limit will exhaust such a policy.
>
> . . . .
>
> Pursuant to express policy language and interpretive case law, fees for attorneys, investigators and experts retained in connection with the defense of lawsuits filed against the policyholder are readily classified as defense costs. In the environmental coverage arena, however, a question concerning the appropriate characterization of certain costs has nevertheless arisen. At issue are costs associated with government-mandated remedial investigation/feasibility studies (RI/FS), or similar government-mandated investigative efforts. Pursuant to CERCLA [the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42

*U.S.C.* §§ 9601 to 9675], the EPA can force a waste site PRP [potentially responsible party] to perform an investigation in order to determine the nature and extent of environmental problems posed by hazardous waste. Similar statutes also create enforcement powers at the state environmental agency level.

The RI/FS process may include the monitoring and sampling of air, water and soil and the compilation of sufficient data to determine the necessity for, and the proposed extent of, any action required to remedy existing contamination. Remedial investigations address whether environmental damage can be mitigated or minimized by controlling the source of the contamination, or whether additional action is necessary because of migration of contaminants from the site. Feasibility studies comprise plans for implementing the remediation alternative selected for the site.

There is no secret as to why an insured under a cost-exclusive policy would argue that RI/FS costs should be classified as part of the insurer's duty to defend. To the extent [that] expenses associated with performing a waste site RI/FS can be attributed to the defense component of the policy, there would be more indemnity coverage potentially available to satisfy the policyholder's liability for the clean-up. There would also be more indemnity coverage potentially available to satisfy liability associated with other claims.

Another reason policyholders may argue that RI/FS costs are part of the insurer's defense obligation is because the duty to defend is often held to be broader than the duty to indemnify. This means [that] an insurer could be called upon to provide a defense in cases where the allegations against the insured conceivably could, if proven, be covered under the terms of the policy. Based on this more generous standard for triggering the duty to defend, policyholders often will move for summary judgment on the duty to defend soon after a lawsuit seeking coverage is filed. The policyholder will argue that the court merely has to facially examine the underlying allegations in order to determine whether a duty to defend exists while fact-sensitive indemnity issues are being litigated in the coverage case.[1]

[Eileen B. Eglin & Stephen D. Straus, *Classifying RI/FS Costs Under a Policy of Comprehensive General Liability Insurance: Indemnity or Defense?*, 5 *Fordham Envtl. L.J.* 385, 386–89 (1994) (footnotes omitted) [hereinafter Eglin & Straus].]

I

As is often the case in environmental matters, this dispute about insurance coverage arises from events now long past. Plaintiff,

---

[1] In this case, we are spared the necessity of considering the extent to which the duty to defend under a CGL policy might exceed the duty to indemnify. The parties entered a stipulation that when the policy's indemnity limits were exceeded, the insurance company's duty to defend its policyholder expired.

General Accident Insurance Company (GAIC or General Accident), issued comprehensive general liability and automobile insurance policies to N.B. Fairclough & Son, Inc. for the period December 31, 1972, to December 31, 1975. The CGL policy provided annual property damage limits of liability of $100,000. During these policy years, Fairclough operated a fuel storage business on Route 202 in Montville Township, New Jersey. The operation included underground and above-ground tanks for the storage of fuel oil and associated underground fuel oil lines. Fairclough sold the property in 1978.

The facts that we recite concerning the environmental cleanup are drawn primarily from the various administrative orders in the record. We are not resolving the facts but merely stating them for background. On February 14, 1974, the Montville Police Department investigated a discharge of approximately 1300 gallons of fuel oil on Fairclough's premises. An act of vandalism had caused the discharge from a tanker truck that was parked on the site. The fuel oil traveled along Route 202 into a storm drain that discharges onto land located approximately fifty feet north of the accident site. The oil then migrated into the ground water and to a tributary of the Pompton River.

In March 1975, the New Jersey Department of Environmental Protection (now referred to as DEPE), investigating a complaint from a nearby resident, found that a private water supply well emitted the odor of petroleum products. Fairclough replaced the private well in the following month. Additional contamination was discovered in March 1977. The Montville Board of Health detected an oil discharge in a pond north of the site and identified the odor of petroleum products in the private supply wells of four nearby residences. DEPE later found pollution of additional private supply wells. In April 1978, Fairclough conducted tests of its fuel lines that revealed that leaks in some of the lines may have allowed the discharge of the hazardous petroleum product. It subsequently replaced the lines.

In 1985, renewed investigations revealed that fifteen nearby homes had petroleum products in their private supply wells. On December 31, 1985, DEPE issued Fairclough a directive letter requiring it to collect and analyze water samples from the contaminated wells and prepare a remedial action plan for the contaminated soil and an investigation and remediation plan for the contaminated groundwater to determine the full extent and degree of contamination at the Fairclough site. Ultimately, the DEPE determined that in order to provide potable water to the nearby residents whose private supply wells had been contaminated, the public water system would have to be extended so that the residents might connect. In a subsequent directive dated April 8, 1987, the Agency ordered Fairclough to pay for the extension of the water mains and to close and seal the contaminated private supply wells. The DEPE estimated that the project would cost $719,400. It informed Fairclough that if it failed to remit payment within thirty days, the DEPE would complete the project using public funds and bring an action against Fairclough for three times the Agency's costs of doing so, as authorized by *N.J.S.A.* 58:10–23.11f. The DEPE later served an administrative order on Fairclough that required it to submit an RI/FS for the site and to analyze and monitor the water supply from all private wells located within a targeted zone. The order also assessed $190,500 in civil administrative penalties pursuant to *N.J.S.A.* 13:1E–9e.

Fairclough demanded that GAIC provide a defense to and indemnity for any claims arising out of the DEPE directives. The CGL policy contained the familiar occurrence clause: "The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence...." On September 8, 1987, General Accident filed a declaratory judgment action, asserting that it had no obligation to defend or indemnify Fairclough because none of the property damage cited by DEPE had occurred during the period of the GAIC policies. In addition, General Accident argued that

the remedies sought from Fairclough by the DEPE directives fell within the pollution exclusion clause in Fairclough's policies.

In March 1990, during the course of the coverage litigation, Fairclough and General Accident entered a stipulation and consent order to the effect that (1) General Accident would provide indemnity coverage to Fairclough in an amount not to exceed the aggregate sum of $100,000 for claims other than bodily injury claims related to the site; (2) General Accident would continue to provide Fairclough with a defense of all claims arising out of certain DEPE directives pertaining to the site; (3) upon exhaustion of the $100,000 through indemnity payments, as differentiated from defense expenses, General Accident's obligation to provide a defense would terminate. Both parties reserved the right to have the trial court determine the "propriety of any payment of any portion of the indemnity limits to a third party."

In January 1994, GAIC brought a motion to enforce litigant's rights seeking a determination that it owed no further duty to indemnify or defend Fairclough based upon its exhaustion of the policy limits of $100,000. General Accident said that it was compelled to bring the motion because the agreement called for a judicial determination of whether environmental response costs constituted defense costs or indemnification costs. It alleged that at the time of the motion, it had paid in excess of $100,000 in response costs pursuant to DEPE directives and administrative orders requiring Fairclough to undertake the remedial investigation of petroleum contamination at its former fuel storage site. GAIC argued that response costs constitute damages under CGL policies and are therefore indemnification costs, not defense costs. The Law Division agreed with GAIC, reasoning that

the damage is done and there is damage, public damage, at the time of the spill. And from that point on, the DEP undertakes to have the—whoever is the one who's done the dumping or owns the property, to clean it up. And part of that cleanup is a requirement that a study be done by an engineer that has to be a qualified engineer. And the engineer is required to follow the methodologies as set forth by the DEP.... DEP says you have to do it. And you then give us the report. And we all go from there. There is a certain amount of negotiation; but,

essentially, the investigation is directed at determining what needs to be done and getting it done.

The Appellate Division reversed. 278 *N.J.Super.* 412, 651 *A.*2d 472 (1995). It maintained that the plain language of the policy encompassed the remedial investigation costs here involved. "The critical language that must be focused upon is the provision that the insurer 'may make such investigation and settlement of claim or suit as it deems expedient' ... [the expenses] plainly serve to delineate and mitigate [Fairclough's] potential ultimate liability, albeit in response to DEPE directives." *Id.* at 417, 651 *A.*2d 472. We granted the plaintiff's petition for certification. 140 *N.J.* 328, 658 *A.*2d 728 (1995).

## II

At first, courts found that costs associated with government orders to cleanup environmental contamination did not constitute "damages." Those courts viewed the governmental order as an equitable remedy distinct from the concept of damages in the law. For example, in *Continental Insurance Co. v. Northeastern Pharmaceutical & Chemical Co.,* 842 *F.*2d 977 (8th Cir.) (en banc), *cert. denied,* 488 *U.S.* 821, 109 *S.Ct.* 66, 102 *L.Ed.*2d 43 (1988), the court equated the assessment of cleanup costs under the comparable provisions of CERCLA with equitable relief and concluded that the term "damages" in the insurance policy had referred only to legal damages and did not cover cleanup costs.

In *Morton International v. General Accident Insurance Co.,* 134 *N.J.* 1, 25, 629 *A.*2d 831 (1993) (citations omitted), *cert. denied,* —— *U.S.* ——, 114 *S.Ct.* 2764, 129 *L.Ed.*2d 878 (1994), we said that "[t]he clear weight of authority, however, among both federal and state courts adopts the view that the undefined term 'damages' in CGL policies should be accorded its plain, non-technical meaning, thereby encompassing response costs imposed to remediate environmental damage." Justice Stein quoted the language of the Washington Supreme Court in *Boeing Co. v. Aetna Casualty & Surety Co.,* 113 *Wash.*2d 869, 784 *P.*2d 507, 511

(1990): "Coverage does not hinge on the form of action taken or the nature of relief sought, but on an actual or threatened use of legal process to coerce payment or conduct by a policyholder." *Morton, supra,* 134 *N.J.* at 26, 629 *A.*2d 831. Accordingly, we held in *Morton* that "environmental-response costs and remediation expenses ... constitute sums that the policyholder will have to pay 'as damages' because of property damage, within the meaning of the CGL policies at issue." *Id.* at 27, 629 *A.*2d 831.

New Jersey's Spill Compensation and Control Act, *N.J.S.A.* 58:10–23.11 to –23.11z, contains an extraordinary sword of Damocles to coerce payment or conduct by a policyholder. Under the provisions of that act, a potentially responsible party (PRP) that refuses to comply with a DEPE directive to provide an RI/FS may be subject to treble damages if found responsible for the pollution. *In re Kimber Petroleum Corp.,* 110 *N.J.* 69, 539 *A.*2d 1181, *appeal dismissed,* 488 *U.S.* 935, 109 *S.Ct.* 358, 102 *L.Ed.*2d 349 (1988). The stakes are critical.

One of the leading cases on the general subject of response costs as damages is *AIU Insurance Co. v. FMC Corp.,* 51 *Cal.*3d 807, 274 *Cal.Rptr.* 820, 799 *P.*2d 1253 (1990). There, federal and state environmental agencies had filed suit against FMC seeking relief for alleged violations of CERCLA. The agencies claimed that FMC was responsible for contaminating seventy-nine different hazardous waste disposal sites, groundwater beneath the sites, aquifers beneath adjoining property, and surrounding surface waters. Their suit sought injunctive relief compelling decontamination of the waste disposal sites, and reimbursement for the agencies' costs of investigating, monitoring, and initiating cleanup of hazardous waste for which FMC allegedly is responsible. *Id.* at 827, 799 *P.*2d at 1260. FMC, in turn, sought recovery from its insurers. FMC argued that these government mandated response costs fell under its CGL policies, which required its insurers to provide coverage for all sums that FMC became "legally obligated" to pay as "damages" incurred because of "property damage." *Id.* at 833, 799 *P.*2d at 1266. The California Supreme Court held

that costs incurred to comply with an injunction mandating clean-up or to reimburse a government agency for cleanup expenses it has incurred constitute "damages" under FMC's insurance policy. The court stated:

> [B]ecause the compensable loss is all remedial out-of-pocket expenditures incurred by the [environmental] agencies, the "compensation" sought ... includes reimbursement for costs of cleaning up existing contamination on and off the disposal site itself, investigating the extent of contamination or the viability of cleanup options, and monitoring the spread of waste from the site. As long as some "property damage" ... has already taken place, the agencies' expenses for responding constitute loss or detriment, whether or not the expenses are attributable to actual cleanup, mitigation of damage, or investigation and monitoring. When the agencies seek reimbursement of such expenses from the insured under CERCLA, their claim is for compensation for all their expenses, not merely those resulting from actual cleanup efforts on government property.
>
> [*AIU, supra,* 274 *Cal.Rptr.* at 837, 799 *P.*2d at 1270 (citation omitted).]

In *Intel Corp. v. Hartford Accident and Indemnity Co.,* 952 *F.*2d 1551 (9th Cir.1991), the court extended the concept of *AIU* to cover costs associated with a consent decree. It reasoned that the "[c]overage of cleanup costs should not turn on the fortuity of the form in which the offending company fulfills its cleanup responsibilities." *Id.* at 1564. Thus, the court held that costs incurred pursuant to a consent decree are covered damages under the policyholder's CGL policy.

Neither of these cases offered an analysis of whether RI/FS costs should be considered as "defense" or "indemnity."

In *Spokane County v. American Re–Insurance Co.,* No. CS–90–256–WFN (E.D.Wash. May 10, 1993), referred to in Eglin & Straus, *supra,* 5 *Fordham Envtl. L.J.* at 395, the court maintained that all costs related to a CERCLA cleanup, whether they concern performance of an RI/FS or implementation of the cleanup remedy, are compulsory in nature. "The court distinguished mandatory investigative efforts under CERCLA from an investigation conducted as part of the defense of a lawsuit against the policyholder." *Id.* at 396. It held that RI/FS costs are damages, and cannot be properly characterized as litigation expenses.

A trilogy of Michigan-based cases provides further analysis. In *Gelman Sciences v. Fireman's Fund Insurance Companies*, 183 *Mich.App.* 445, 455 *N.W.2d* 328 (1990), *appeal denied*, 439 *Mich.* 901, 478 *N.W.2d* 447 (1991), Gelman, like Fairclough, was required to make large expenditures to install sewers and to connect private parties to the city water system after Gelman had contaminated their water supplies. That court defined defense costs to include "monies expended to develop and put forth a theory that the defendant is not liable," while indemnification costs, being damages, were defined as "monies paid to compensate for injury suffered [by the plaintiff] through the unlawful act or omission or negligence of another." *Id.* at 330. Gelman argued that its expenditures should be classified as defense costs because they were incurred voluntarily in an effort to mitigate future claims for injuries and thereby reduce its liability. The court rejected this argument and held:

> The hookup and sewer installations are not necessary to defend Gelman. Rather, they represent an attempt to prevent injury that may occur in the future due to present ground water contamination.... Preventative measures are cost effective and commendable, but in this case, they are indemnification damages not defense costs.
>
> [*Ibid.*]

In *Higgins Industries v. Fireman's Fund Insurance Co.*, 730 *F.Supp.* 774 (E.D.Mich.1989), Higgins' CGL carriers initially denied coverage for the costs associated with an investigation into groundwater contamination that was ordered by the Michigan Department of Natural Resources. The carriers contended that their duty to defend the company attaches only at the commencement of a formal legal proceeding. *Id.* at 775. The court held that the carriers' duty to defend arose upon "an actual or threatened use of legal process to coerce payment or conduct by a policyholder." *Id.* at 778 (quotation omitted). It then referred the case to a federal magistrate for a determination of which costs were defense costs and which were indemnity costs.

After an evidentiary hearing, the magistrate found that environmental studies performed prior to a certain date (July 1, 1987) primarily determined whether the contaminants had come from

the policyholder's property or from an adjacent industrial site. *Higgins Indus. v. Fireman's Fund Ins. Co.*, No. 87–CV–10406 (E.D.Mich. Oct. 23, 1990) (magistrate's report and recommendation), reprinted in *Mealey's Litig. Rep., Insurance*, Nov. 20, 1990, p. B1. Because those studies were considered efforts to determine the nature of the problem, where the contaminants were, and where they had come from, the magistrate classified them as defense costs. The court noted, however, that after July 1, 1987, the focus of the investigation shifted to determining the appropriate means to correct the problem and to prevent further migration of the contaminants. This shift served as the dividing line between those investigative expenses that were defense costs and those that were compensable, if at all, under the indemnity portion of Higgins' CGL policy. The magistrate relied on *Gelman* in holding that those expenditures that were undertaken to correct the problem and to mitigate future damages should not be classified as defense costs.

In the third of the trilogy, *Fireman's Fund Insurance Companies v. Ex–Cell–O Corp.*, 790 *F.Supp.* 1318 (E.D.Mich.1992), the court adopted a special master's report that concluded that hydrogeological studies, undertaken in response to various governmental demands, were studies that an environmental defense lawyer would need to defeat or limit a policyholder's liability. *Id.* at 1336, 1338. The court recognized the difficulty of drawing the line between studies that will help to "mitigate or reduce liability" and those that are done to "correct the problem." The *Ex–Cell-O* court held that "defense costs include not only those reasonable and necessary costs to defeat or limit liability, but also those costs, including consulting fees, that are reasonable and necessary to limiting the scope and/or costs of remediation, even if similar or identical studies have been ordered by the government." *Id.* at 1338.

### III

Each of these cases reaches a result but none provides a comprehensive principle of decision. For example, the threads of

policy that underlie these decisions pull in different directions. These policy considerations include the following:

(1) *Fortuity*

Fortuity should not dictate the outcome of the controversy. This principle was relied upon by the *AIU* court, the *Intel* court and our own Appellate Division in *Broadwell Realty Services v. Fidelity & Casualty Co.*, 218 *N.J.Super.* 516, 528 *A.*2d 76 (App. Div.1987), *overruled on other grounds, Morton, supra,* 134 *N.J.* at 28, 629 *A.*2d 831. For example, in *AIU* it was considered fortuitous that the government had ordered the potentially responsible party to conduct the RI/FS studies rather than to have undertaken the task itself. *AIU, supra,* 274 *Cal.Rptr.* at 830, 799 *P.*2d at 1263. In *Intel* it was considered fortuitous that the PRP had entered a consent decree to perform the necessary response costs. *Intel, supra,* 952 *F.*2d at 1564. In *Broadwell* it was considered fortuitous that abatement measures were taken on the policyholder's property rather than on adjacent lands, and that the measures were in response to a DEPE directive. *Broadwell, supra,* 218 *N.J.Super.* at 527, 528 *A.*2d 76. In each case, the court found that the legal results should be the same regardless of the circumstances under which the expenditures were made.

In this case fortuity cuts both ways. General Accident may consider it fortuitous that the DEPE ordered Fairclough to conduct an RI/FS because the insurance company might thereby avoid financial responsibility for investigative defense costs that it would otherwise be bound contractually to furnish. On the other hand, it may be fortuitous for the policyholder that the extraordinary costs for remedial investigations be absorbed by an insurance company regardless of its policy limits.

(2) *Fair expectations of the parties*

One of the dominant themes of insurance law is that the outcome should fulfill the fair expectations of the parties. We have recognized, however, in this context of commercial CGL

coverage, that the parties to the contracts are on a much more level playing field and that contract-of-adhesion principles are not as fully applicable as in other circumstances. *Owens–Illinois, Inc. v. United Ins. Co.,* 138 *N.J.* 437, 471, 650 *A.*2d 974 (1994). We may safely assume that policyholders generally expect that a careful investigation of their potential liability will be provided by their insurance company pursuant to its duty to defend against any claims. Likewise, most insurance companies expect that they will incur these expenses. That the government orders a policyholder to perform remedial investigations does not change the character of the work or the initial expectations of the parties. The more difficult question is whether a policyholder could fairly expect that an insurance company would bear limitless liability to perform remedial investigations when those investigations were incidental to a mandated environmental cleanup. Or, put differently, the question is whether an insurance company that had issued a policy with limits of $100,000 would expect to undertake a remedial study that might cost millions of dollars.

### (3) *Conservation of resources*

Conservation of resources should be a goal of our decisionmaking. In *Ayers v. Jackson Township,* 106 *N.J.* 557, 608, 525 *A.*2d 287 (1987), in deciding whether to allow recovery for medical surveillance damages in cases of increased risk due to pollution, we considered the extent to which our decision would make the most cost-efficient use of the resources available to cope with environmental disease or damage. A related principle of decisionmaking is to provide incentives for parties to engage in responsible conduct that will increase, not decrease, available resources. For example, in *Intel, supra,* the court reasoned that

> [i]f consent decree compliance costs did not constitute "damages," insureds would be discouraged from entering into consent decrees, and the EPA's task would be more time consuming and more costly. Cleanup would be delayed until the government expended its resources to investigate contamination, and perhaps even to conduct cleanup itself, and finally sought relief from the insured.

> [*Intel, supra,* 952 *F.*2d at 1564 (citation omitted).]

Although treating RI/FS costs as damages (as when policyholders promptly consent to perform an RI/FS) tends to expedite settlement and disposition of environmental cleanup cases, treatment of such costs as defense costs would increase the amount of resources available for environmental cleanups (because the duty to defend is often exclusive of the policy limits).

In short, the factors conflict. To find a single litmus test for decision is difficult. The *Spokane* rule, which holds that if the expenses are mandatory they are necessarily indemnity, conflicts with the reality expressed in *County of Santa Clara v. United States Fidelity and Guaranty Co.*, No. C–93–20169RPA, 1995 WL 638568 (N.D.Cal. Oct. 23, 1995). The rule would enable insurance companies to "kill two birds with one stone." *Id.* at *4. In *Santa Clara*, the court reconsidered an earlier decision that all of the County's investigation costs fell within the duty-to-defend component of its insurance policies. In reversing its prior order, the court reflected upon the dual aspects of an RI/FS.

> [A]n interpretation [that RI/FS costs are exclusively indemnity costs] would mean that in many cases there would not be any investigation costs payable as defense costs. This would be so even though the investigations conducted at the behest of the government agency were integral to a defense and would have been conducted anyway absent a government order. While this would delight insurance companies in that it would reduce defense costs—which at times far exceed indemnity limits in environmental coverage cases—it is not a tenable result. It would make extent of the defense obligation turn upon the mere fortuity of the statutory mechanism chosen by the government to remediate the site.
>
> [*Ibid.* (citation omitted).]

Hence, we believe that the only fair result is a balanced solution that takes multiple factors into account. If it is clear that the expenditure clearly kills two birds with one stone in the sense of fulfilling a defense obligation while also relieving the policyholder of a potential claim for damages, the proper solution appears to be a fair allocation of the RI/FS costs between defense and indemnity provisions of the policy. At the same time, we do not want to encourage needless litigation. The advantage of a black-letter rule is simplicity in administration. We must avoid, at all costs, another war of experts to determine how much of the costs should be allocated to defense and how much to indemnity.

We believe that there should be a presumption that mandated costs are indemnity costs to be allocated to the indemnity provisions of the policy. The burden should be on the policyholder to show that the insurance company has derived an unjust benefit from such an allocation to the extent that it has relieved the insurance company of an expense that it would otherwise have incurred under its obligation to defend. As is the case here, these disputes will often arise in the context of a larger controversy about environmental contamination involving the environmental agencies, PRP's and their insurance companies.

■ Such disputes seem ideally suited for mediation or arbitration under court-annexed programs of alternate dispute resolution or on the parties' own initiative. Failing such resolution of the dispute in whole or in part, trial courts (upon recommendation of a master if one is appointed by the court) shall have broad discretion to resolve, based on written submissions without any additional expert testimony, a fair allocation of the costs between the defense and indemnity provisions of the policies. The scope of review of the trial court's allocation shall be limited by the familiar principles of appellate review. Among the factors the tribunal should consider are the following: (1) the relative risk that the PRP bore if it did not produce the RI/FS; for example, how realistic was the threat of treble damages; (2) the extent to which the details of the RI/FS may have been mandated by the environmental agencies; (3) the extent to which the RI/FS studies provide a means by which the insurance company or the policyholder would be relieved of or be able to mitigate potential claims for damages; and (4) the cost of producing the RI/FS in relation to the policy limits provided.

Among other evidence, the tribunal in this case should consider the extent to which the DEPE mandated the studies and approved their methodology, as well as the parties' stipulation to policy limits of $100,000. On the other hand, the tribunal should consider that, in its engagement letter, the engineering company hired to perform the RI/FS study told GAIC's attorneys that the

company's "primary objective is to prepare a technical plan which will form one of the cornerstones of your negotiation with the [DEPE]." In *Bahrle v. Exxon Corp.*, 279 *N.J.Super.* 5, 652 *A.*2d 178 (App.Div.), *certif. granted, Bahrle v. Texaco Corp.*, 140 *N.J.* 326, 658 *A.*2d 726 (1995), now pending before us, detailed engineering studies were able to eliminate one PRP's liability for a spill based upon the nature of the compounds and the undisputed groundwater velocity rate agreed upon by the parties' expert witnesses. Such studies clearly help to mitigate or reduce liability. *Ex–Cell–O, supra,* 790 *F.Supp.* at 1338.

The issues are legally and scientifically complex. We said on another occasion that courts cannot simplify what is intrinsically complex. We can, however, try to provide procedures to simplify their resolution. *Owens–Illinois, supra,* 138 *N.J.* at 480, 650 *A.*2d 974. In the exercise of our jurisdiction we must attempt to provide the most cost-efficient method of resolving disputes that are not plainly controlled by policy language. It is quite obvious to us that in most instances, RI/FS studies probably do serve to discharge an obligation of the PRP. There will almost always have been an "actual or threatened use of legal process to coerce ... a policyholder" to make payment for the RI/FS. *Morton, supra,* 134 *N.J.* at 26, 629 *A.*2d 831 (citation omitted). At the same time, the RI/FS studies may also discharge an obligation of the insurance company to provide a potential defense to or mitigation of damages. Principles of simple justice suggest that there should be an allocation of the costs between defense and indemnity. Each party to the policy has had an obligation discharged.

Because the issues that we confront today were not expected when the policies were drawn, we suspect that the drafters would not resist "a simple approach that would allow some latitude in each case for the courts to make an equitable decision on the facts." *Owens–Illinois, supra,* 138 *N.J.* at 469, 650 *A.*2d 974 (citation and quotation omitted). An allocation that is swift, with perhaps a rough measure of justice, appears to us to be the best procedure to simplify resolution of these issues.

The judgment of the Appellate Division allocating all of the costs of the RI/FS to the defense provisions of the policy is reversed. The matter is remanded to the Law Division to make a fair allocation of the RI/FS costs between the defense and indemnity provisions of the policies.

*For reversal and remandment*—Chief Justice WILENTZ and Justices HANDLER, POLLOCK, O'HERN, GARIBALDI, STEIN and COLEMAN—7.

*Opposed*—None.