**ENDICOTT JOHNSON CORPORATION,**
**Plaintiff,**

v.

**LIBERTY MUTUAL INSURANCE**
**COMPANY, Defendant.**

**No. 92–CV–1689.**

United States District Court,
N.D. New York.

June 11, 1996.

Nixon, Hargrave Law Firm (William S. Brandt, Allan D. Hymes, of counsel), Rochester, NY, for Plaintiff.

Mintz, Levin Law Firm, Boston, MA (Lee Glickenhaus, of counsel), for Defendant.

## MEMORANDUM–DECISION AND ORDER

McAVOY, Chief Judge.

## I. INTRODUCTION

**Plaintiff Endicott Johnson Corporation** commenced this declaratory judgment action against defendant in 1992. Plaintiff seeks insurance coverage from **defendant Liberty Mutual Insurance Company** for defense costs and indemnification with respect to actions commenced by the United States Environmental Protection Agency ("EPA") against plaintiff. EPA has named plaintiff a potentially responsible party ("PRP") in regard to the cleanup of a landfill known as the Endicott Landfill ("Landfill"), and with regard to the cleanup of a site known as the

Tri–Cities Barrel Company ("Tri–Cities"). The Court previously granted summary judgment in part in favor of defendant to the extent that the pollution exclusions in the 1971–81 Comprehensive General Liability ("CGL") policies free defendant from liability to plaintiff on those policies. Summary judgment was also granted in part in favor of plaintiff to the extent that defendant *is* liable to defend and indemnify plaintiff up to the available limits of the pre–1971 policies.

Plaintiff now moves (1) to dismiss defendant's third and twenty-first affirmative defenses and for a declaration that there are no policy provisions that reduce the annual policy limits available to plaintiff; and (2) for an order declaring remedial investigation/feasibility studies ("RI/FS") costs to be defense costs. The Court consequently faces two questions that concern matters of first impression in the Second Circuit: (1) What are the 'available limits' of the pre–1971 policies? and (2) Are expenses associated with the RI/FS studies undertaken at the two dumps 'defense' costs or 'indemnification' costs? The Court heard oral arguments on June 10, 1996; the following constitutes the Court's findings of fact and conclusions of law with respect to the issues raised.

## II. BACKGROUND

Beginning in 1944 and continuing until 1981, plaintiff purchased CGL insurance policies from defendant. Each of these policies was for a one-year term and was designed to protect plaintiff from, *inter alia,* expenses arising from claims for property damage made by third parties. Until 1979, each year's primary policy carried annual property damage limits of $100,000 per occurrence; in 1980 and 1981, they carried limits of $250,000 per occurrence. Moreover, between 1976 and 1981 Excess/Umbrella policies carried property damage limits of $3 million per occurrence. Finally, under the 1955 through 1966 policies, defendant is required to pay defense costs even to the extent they exceed policy limits.

In two letters dated February, 1988, EPA claimed that plaintiff, along with International Business Machines ("IBM"), the Village of Endicott, and the Town of Union, was re-

sponsible for contaminating the Village's municipal water supply in the Endicott Wellfield. These "PRP letters" asserted that hazardous substances had been and would continue to be released into the Wellfield from the nearby Endicott Landfill. They also asserted that Plaintiff shared the blame because it had arranged for the disposal of hazardous substances at the Landfill between 1957 and 1983.

Plaintiff had, in fact, used the Landfill continuously between 1957 and some point in the 1970s, when the site was closed. Plaintiff sent for disposal and burial a variety of substances, including leather, adhesives, solvents, and other chemicals, some of which were later defined as "hazardous substances" under CERCLA. This dumping apparently was done in accordance with industry standards, and before hazardous materials were regulated to any serious extent. EPA eventually demanded that plaintiff and the other PRPs undertake certain remedial measures at the Landfill site. First, they were instructed to install an "air diffuser" to reduce the contamination. Second, they were to conduct an RI/FS focused on the Landfill as the suspected source of contamination at the Wellfield. Plaintiff notified defendant of these demands in a timely fashion. Finally, the PRPs were directed to cap the Landfill with a leachate collection system at significant cost. Faced with what it saw as a strict liability law and "undeniably bad facts," plaintiff decided to settle the claims made by EPA.

Soon after the Landfill incident came to a head, EPA asserted another CERCLA claim against plaintiff. Tri–Cities Barrels Company had run a barrel recycling business in Port Crane, New York, since 1955. Various commercial and industrial users, including plaintiff, would send their used barrels to Tri–Cities, where they would be cleaned and reconditioned for reuse. This process resulted in wastewater containing hazardous substances that had been left inside the barrels. Unfortunately, Tri–Cities left the waste in unlined ponds and it contaminated soil and groundwater.

In May, 1991, EPA named plaintiff and twenty other users as PRPs at the Tri–Cities

site. EPA contended that between 1955 and 1983, plaintiff sent barrels containing residual amounts of hazardous chemicals to be reconditioned. Plaintiff actually had delivered as many as 4,000–6,000 of such barrels each year. EPA once again demanded that the PRPs pay for an RI/FS to determine the extent of the contamination and the options available for long-term remediation. Plaintiff, faced with another tough situation— since it had in fact sent thousands of barrels to the site—settled with EPA concerning the cost of the ongoing investigation at Tri–Cities. The settlement did not, however, address remediation measures.

At issue on the present motions are the 17 CGL policies that defendant issued to plaintiff between December 1, 1954, and December 1, 1970. In its previous decision, the Court held that property damage at the Endicott Landfill triggered the 1956–70 insurance policies and property damage at the Tri–Cities Barrel site triggered the 1954–70 policies. Again, each of these policies provides for an annual per occurrence limit of liability of $100,000. The aggregate limit of each of the policies also is $100,000. Thus plaintiff essentially seeks $1.7 million, or $100,000 from each of the seventeen policies between 1954–70. Defendant argues that these amounts are not fully available to plaintiff because of various limitations in the policies. This theory is vaguely asserted in defendant's Third and Twenty–First Affirmative defenses in the Answer, so plaintiff seeks to have those defenses dismissed and/or a declaration that there are no policy provisions that reduce the annual policy limits available to plaintiff.

Defendant admits that $100,000 is available on each of the 10 policies prior to 1964. However, defendant points to the following provisions to limit plaintiff's recovery on the 1964–70 policies:

(1) "Deemer" clause (1964–65 policies): this clause provides that

[w]ith respect to injury or destruction of property ... *caused by exposure to injurious conditions over a period of time involving two or more liability policies ...* all such injury, destruction ... caused by the same injurious conditions shall be

deemed to occur only on the last day of the last exposure and *the applicable limit of liability contained in the policy in effect on the last day of such exposure shall be the applicable limit of liability.*

(10/6/94 Stipulation Ex. 10 at 5 (emphasis added).) Defendant claims that plaintiff used the Endicott Landfill until at least 1972 and the Tri–Cities Barrel site until at least 1983. Thus defendant argues that the "last day of exposure" occurred on a date when plaintiff had no coverage with defendant either because no policy was in place or a pollution exclusion prevented recovery.

(2) "One–Year Reporting" requirement (1964–65 policies): this clause provides that

if the insured at the time a claim is made against it *is no longer covered by a liability policy issued by the company,* this policy shall not apply ... to injury to or destruction of property ... that is caused by exposure to conditions over a period of days, weeks, months, or longer and *that is not reported by the insured to the company within one year after the policy period.*

(*Id.* (emphasis added).) Defendant asserts that plaintiff's last policy expired on January 1, 1982, but plaintiff did not report the CERCLA claims against it until April, 1988, five years too late.

(3) "Non–Cumulation" clause coupled with "One Occurrence" provision (1966–70 policies): the "One Occurrence" clause is a standard general liability provision whereby "all ... property damage arising out of continuous or repeated exposure to substantially the same general conditions ... shall be considered as arising out of one occurrence." Defendant argues that EPA is pursuing plaintiff for property damage from repeated exposure to substantially the same general conditions—in other words, repeated dumping of substantially the same thing (industrial waste). Thus defendant believes there is only *one* "occurrence" at the heart of this lawsuit. This fact is important when we consider the "Non–Cumulation" clause, which states that

[i]f the *same occurrence* gives rise to ... property damage that occurs partly before and partly within the policy period, then

each occurrence limit and the applicable aggregate limit ... of this policy *shall be reduced by the amount of each payment made by the company with respect to such occurrence under a previous policy or policies* of which this policy is a replacement.

(*Id.* Ex. 14 at 6 (emphasis added).) Defendant apparently claims that if it pays plaintiff $100,000 under the 1966 policy, this payment will reduce the per occurrence and aggregate limits of each of the 1967–70 policies to zero under the non-cumulation clause. In defendant's view, the non-cumulation clause prevents plaintiff from "stacking" the policy limits of the 1966–70 policies.

The second half of plaintiff's motion is relatively simple—are the expenses incurred by plaintiff in relation to the RI/FS studies properly categorized as "defense" costs or "indemnification" costs?[1] Of course, this question is of concern to plaintiff because there is no limit to the amount plaintiff can charge defendant for defense costs under the 1955–66 policies. Plaintiff generally argues that RI/FS costs are necessary, unavoidable expenses in presenting its defense because they have the potential to reduce plaintiff's ultimate liability. Defendant counters that the costs at issue here fall squarely within the category of "response costs" or costs associated with "the planning and execution of site cleanup" which have sometimes been held to be indemnification costs.

## III. DISCUSSION

### A. *OCCURRENCES ISSUE*

To start off, the Court regrets the confusion caused by its use of the word "occurrence" in the previous summary judgment decision in this case. Apparently plaintiff read a little more into the Court's language than the Court intended, but it is easy to understand why that was the case. To set the record straight, defendant's interpretation of the Court's summary judgment decision is correct. The issue of whether plaintiff's dumping represented one or many "occurrences" under the definition contained

in the policies was not before the Court on those prior motions. Instead, the Court faced the question of whether plaintiff was entitled to look to available coverage under the policies in effect during the years when plaintiff was dumping at the sites, or whether plaintiff was completely without recourse because the property damage was not discovered until the 1980s.

What the Court really found in its prior decision was that each act of dumping over the years by plaintiff caused property damage upon contact. In other words, each act of dumping clearly constituted an occurrence of *property damage*, using the ordinary dictionary meaning of the word "occurrence." This fact was dispositive on the prior motion because the insurance policies in question only cover liability for property damage that results *during the policy periods*. The Court found that property damage arose many times during each policy period and not merely when the damage was discovered, so each policy was triggered and plaintiff satisfied the threshold inquiry towards collecting on the policies. Put another way, all the Court ruled was that the 1954–70 policies potentially provide plaintiff coverage. To complete the inquiry into whether and how much coverage actually is available, the Court must look to the policies' exclusions and limitations provisions.

■ *Now* before the Court is the issue of whether plaintiff's dumping at each waste site constituted one occurrence or multiple occurrences under the legal definition of "occurrence" in the insurance policies. To cut to the heart of the matter, the Court finds, based essentially on the same reasoning as that implemented by the district court in *O–I Brockway Glass Container, Inc. v. Liberty Mut. Ins. Co.*, Civ. No. 90–2797 (D.N.J. Feb. 9, 1994), that two occurrences took place here—one at the Endicott Landfill and one at the Tri–Cities Barrel site. The insurance policies state that "all ... property damage arising out of continuous or repeated exposure to substantially the same general condi-

---

1. At issue is (1) $384,200 paid by plaintiff for the RI/FS at the Landfill; (2) $252,964 paid by plaintiff for oversight costs EPA incurred in connection with several investigations at the Landfill; and (3) $252,710 paid by plaintiff to date for the performance of a remedial investigation at the Tri–Cities site.

tions ... shall be considered as arising out of one occurrence," and the Court sees plaintiff's repeated dumping at both sites as "repeated exposure to substantially the same general conditions."

■ As a general rule, determination of the number of occurrences for insurance purposes requires a court to look to the event for which the insured is held liable, not some point further back in the causal chain. *See Arthur A. Johnson Corp. v. Indemnity Ins. Co.,* 7 N.Y.2d 222, 196 N.Y.S.2d 678, 684, 164 N.E.2d 704 (Ct.App.1959). Like the plaintiff in *Brockway Glass,* plaintiff in this case was not ordered by EPA to clean up the waste sites based on the specific number of deliveries it made or based on differences in the substances dumped. Rather, plaintiff's liability "has one cause: it disposed of tons of waste at [Endicott and Tri–Cities] over a twenty-year period." *Brockway Glass,* slip op. at 9–10. Thus while many instances of "property damage" resulted at each site that triggered plaintiff's insurance policies, which cover liability for property damage, they all derived from one "occurrence" at each site.

The recent Second Circuit decision cited by plaintiff, *Stonewall Ins. Co. v. Asbestos Claims Management Corp.,* 73 F.3d 1178 (2d Cir.1995), does not compel a different conclusion. *Stonewall* addressed the number of occurrences for purposes of determining the per occurrence deductibles on CGL policies issued to a manufacturer of asbestos that had been sued for property damage arising from the installation of its products in many places over many years. The Second Circuit rejected the argument that the insured's "general decision to manufacture asbestos" represented one occurrence, 73 F.3d at 1214, and found that many occurrences had taken place.

However, while plaintiff apparently believes that *Stonewall* represents a time-specific decision—i.e., there was an occurrence each *time* the product was installed—the Court views *Stonewall* as a place-specific decision—i.e., there was an occurrence in each *place* the product was installed. In fact, the Second Circuit expressly held that "each *location* at which [the] products are present, reflecting a separate installation of those

products, is the site of a separate occurrence...." *Id.* Thus the Court's decision in this case is entirely consistent with *Stonewall,* because the Court has held that Endicott and Tri–Cities, each a location at which waste products are present, is the site of a separate occurrence. To continue with the *Stonewall* analogy, Endicott and Tri–Cities each reflect a separate "installation" of plaintiff's "product" (waste materials), although the installation took place over a much longer period of time than it did at each site in *Stonewall.*

### B. NON–CUMULATION CLAUSE

■ Turning now to the Non–Cumulation clause, plaintiff's primary defense against its application is that there was not one occurrence, but multiple occurrences. With that response rejected, the Court must address plaintiff's other arguments. First, plaintiff asserts that because the Court found in its prior decision that "property damage ... immediately resulted each time there was an act of disposal," plaintiff's claim is based on successive instances of property damage, each of which took place completely within and not "partly before and partly within" each policy period. (Pl.'s Mem.Supp.Mot. at 13.) Second, even if defendant's interpretation of the Non–Cumulation clause is reasonable, plaintiff believes some ambiguity exists in the clause and defendant has failed to meet its heavy burden to establish that its interpretation of the clause is the only reasonable one.

Although the Court recognizes the maxim of construing ambiguous provisions in favor of policyholders, *see, e.g., Uniroyal, Inc. v. Home Ins. Co.,* 707 F.Supp. 1368, 1377 (E.D.N.Y.1988), after review of the record the Court does not find the Non–Cumulation clause ambiguous. The Court consequently declines to interpret the provision "in a manner contrary to the intent of the parties, simply to achieve a result favorable to the insured." *Stonewall,* 73 F.3d at 1214. Although a clause with this specific language has not previously been addressed in this circuit, the Court once again believes that the *Brockway Glass* case—which dealt with an identical clause—contains the correct result:

The Non–Cumulation clause in both content and title clearly states that the insured shall not recover more than the per occurrence limit by invoking coverage under several policies for the same occurrence.... If one asked a reasonable person whether the Non–Cumulation clause would allow an insured to recover the $[100,000] limit under all of the [1966, 1967, 1968, 1969] and [1970] policies *for the same occurrence,* the answer would most certainly be "no." ... An insured would have the reasonable expectation that the Non–Cumulation clause prohibits the recovery of more than the per occurrence limit for each occurrence....

*Brockway Glass,* slip. op. at 6–7. Here, plaintiff has taken advantage of the *absence* of a Non–Cumulation clause in the pre–1964 policies by "stacking" them, and it cannot be permitted to achieve the same result even when a Non–Cumulation clause is present.

### C. DEEMER CLAUSE

As with the Non–Cumulation clause, there are no Second Circuit cases that interpret a Deemer clause like the one at issue here. Thus the Court initially must determine if the provision has a plain meaning. If it is susceptible of at least two fairly reasonable meanings, under New York law the Court must then examine any extrinsic evidence. *American Home Prods. Corp. v. Liberty Mut. Ins. Co.,* 748 F.2d 760, 765 (2d Cir.1984), *aff'g as modified,* 565 F.Supp. 1485 (S.D.N.Y.1983). Only "after all aids to construction have been employed but have failed to resolve the ambiguities" should the Court apply the maxim that ambiguities are to be construed against the insurer. *Schering Corp. v. Home Ins. Co.,* 712 F.2d 4, 10 n. 2 (2d Cir.1983).

After performing this analysis, the Court finds that the Deemer clause—or, more specifically, the word "exposure" in the clause—is susceptible of at least two different meanings: (1) all property damage at the Endicott and Tri–Cities sites shall be deemed to occur on the last day of the "occurrence"—the day that the last dumping took place; and (2) all property damage at the sites shall be deemed to occur on the last day of contamination—the day the waste is cleaned up. The prob-

lem with these conflicting interpretations is that if the latter definition applies, it would be difficult or impossible to apply the Deemer clause consistently to gradual pollution damage. The pollution "may never be cleaned up and there will be no last day of exposure," because governmental remediation orders do not require cleanup in many cases. *United Technologies Corp. v. Liberty Mut. Ins. Co.,* Civ. No. 87–7172, slip op. at 48, 1993 WL 818913 (Mass.Dist.Ct. Aug. 3, 1993).

Because the parties have not presented any helpful extrinsic evidence regarding the proper interpretation, this ambiguity should, by law, be construed against the insurer. Accordingly, the Court finds that in pollution cases such as this, where property damage occurred during every year that dumping took place, the Deemer clause is inapplicable. The Court notes that the clause was included in policies before there was a general awareness of environmental pollution problems. *See id.* at 45. As a result, just as the Court held in its previous summary judgment decision, coverage for property damage caused by gradual pollution is afforded by the policy or policies in force when the property damage occurred. *Cf. American Home Prods.,* 565 F.Supp. at 1499 (in policies with Deemer clause, parties still "intended and understood basic policy coverage to apply to injuries shown in fact to have occurred during the policy period").

### D. ONE–YEAR REPORTING CLAUSE

The last clause to be interpreted by the Court is the One–Year Reporting provision. This clause strikes the Court as unusual and as one that might appropriately have been raised for consideration in the previous summary judgment decision. Defendant explains its omission by arguing that the clause is not an exclusion or notice provision, but rather is a limitation intended "to limit coverage for continuing exposures." (Def.'s Mem. Opp.Mot. at 17.) In lieu of the *American Home Products* analysis, the Court accepts this characterization by defendant of the clause's purpose. The Court cannot discern any other perspective on the clause that would not transform it into a notice provi-

sion, and the Court already has decided that plaintiff gave defendant proper notice.

Even under defendant's interpretation, however, law of the case in this action is that the 1954–70 policies were triggered by property damage that occurred during each of the policies. Defendant is not being asked to provide coverage under the 1964 & 1965 policies for "continuing exposures"—it is being asked to provide coverage under those policies for damage that took place during 1964 & 1965. Thus a finding of coverage under these two policies does not impugn the purpose, as stated by defendant, of the One–Year Reporting clause. In sum, the terms of an insurance policy in New York have long been accorded "a natural and reasonable meaning [corresponding to] the reasonable expectation and purpose of the ordinary businessman." *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1207 (2d Cir.1989), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). Assuming notice provisions are satisfied in policies with this one-year reporting clause—here the Court has held that they were satisfied—an insured would have the reasonable expectation that basic policy coverage still would apply to injuries shown in fact to have occurred during the policy period. *Cf. American Home Prods.*, 565 F.Supp. at 1499.

### E. RI/FS COSTS

The last issue for adjudication before the Court is plaintiff's motion for an order declaring that RI/FS and EPA oversight costs are covered defense costs. Plaintiff generally argues that such expenses are necessary, unavoidable expenses in presenting its defense because they have the potential to reduce plaintiff's ultimate liability. Defendant counters that the RI/FS costs at issue here fall squarely within the category of "response costs" or costs associated with "the planning and execution of site cleanup" which have on some occasions been held to be indemnification costs. The applicable caselaw on this issue is as jumbled as the law related to all the other issues on this motion; the Court has considered cases in which *no* amount of RI/FS expense was held to be a defense cost, *e.g., Spokane County v. Ameri-*

*can Re–Insur. Co.*, Civ. No. 90–256 (E.D.Wash. May 10, 1993), cases in which *some* expense was so categorized, *e.g., Higgins Indus. v. Fireman's Fund Ins. Co.*, 730 F.Supp. 774 (E.D.Mich.1989), and cases in which *all* the expense was held to be a defense cost, *e.g., Hi–Mill Mfg. Co. v. Aetna Casualty & Sur. Co.*, 884 F.Supp. 1109 (E.D.Mich.1995). Unfortunately, none of these numerous cases are binding on the Court with the exception of *New York v. Blank*, 745 F.Supp. 841 (N.D.N.Y.1990), *aff'd in part*, 27 F.3d 783 (2d Cir.1994), which is not very helpful.

The Court is impressed with the apparent fairness of the decision in the case submitted late by defendant, *General Accident Ins. Co. of America v. New Jersey*, 143 N.J. 462, 672 A.2d 1154 (Sup.Ct.1996). There the Supreme Court of New Jersey held that "the proper solution appears to be a fair allocation of the RI/FS costs between the defense and indemnity provisions of the policy." *Id.* at 476, 672 A.2d at 1162. This Court agrees with that assessment. In most instances, RI/FS studies probably do serve to discharge some indemnity obligation of the PRP, as well as some defense obligation of the insurance company. Yet the Court also agrees with *General Accident*'s admonition that

> [a]t the same time, we do not want to encourage needless litigation. The advantage of a black-letter rule is simplicity in administration. We must avoid, at all costs, another war of experts to determine how much of the costs should be allocated to defense and how much to indemnity.

*Id.*

The Court's problem with the *General Accident* decision is with New Jersey's ultimate solution to this dilemma. Immediately after noting the advantages of a black-letter rule and the danger in a war of experts, the New Jersey court comes up with a process for determining the defense/indemnity allocation that it admits is "legally and scientifically complex." *Id.* at 478, 672 A.2d at 1163. This process includes considering very subjective factors like (1) the relative risk that the PRP bore if it did not produce the RI/FS; (2) the extent to which the details of the RI/FS would have been performed in the absence of

any mandate by the EPA; and (3) the extent to which the RI/FS studies provide a means by which the insurance company or the policyholder would be relieved of or be able to mitigate potential claims for damages. Such an analysis is about as far from a black-letter rule as we could get.

Where *General Accident* attempts to provide "a simple approach that would allow ... the courts to make an equitable decision on the facts" but fails to follow through, this Court hopes to do better. Thus the RI/FS costs will be allocated as follows, and *no* other factors will be considered.[2] To the extent that an expense is primarily attributable to remedial investigations—which address the sources and extent of the contamination, whether environmental damage can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site—the expense will be treated as a defense cost. To the extent an expense is primarily attributable to feasibility studies—which comprise plans for selecting and implementing the remediation alternative for the site—the expense will be treated as damages to be indemnified. Finally, to the extent the Court cannot determine based on written submissions whether an expense is attributable to either RI or FS, the Court will have broad discretion to allocate the expense in an equitable manner.[3]

This result is similar to that in the remand of *Higgins Indus. v. Fireman's Fund Ins. Co.*, 730 F.Supp. 774 (E.D.Mich.1989). In that case the magistrate judge found that environmental studies performed prior to a certain date (July 1, 1987) would be treated as defense costs because they primarily concerned "efforts to determine the nature of the problem, where the contaminants were, and where they had come from." *See General Accident*, 143 N.J. at 473, 672 A.2d at 1160. But expenses for studies performed after that date would be compensable, if at all, under the indemnity portion of the insurance policies. The focus of these later studies "shifted to determining the appropriate means to correct the problem and to prevent further migration of the contaminants."[4] *Id.*

The Court also thinks that this outcome points us toward our goal of fulfilling the fair expectations of the parties. Policyholders and insurance companies generally expect that a careful investigation of the insured's potential liability will be provided by the insurer pursuant to its duty to defend. However, it is unlikely that a policyholder could fairly expect that an insurance company would bear limitless liability to perform feasibility studies, especially when those studies begin the process of mandated environmental cleanup. Furthermore, the Court does not believe that such an outcome is inconsistent with *Blank*, which states only that recovery of expenses is permissible for "a reasonable amount of testing, investigation, and analysis" necessary to an insured's defense. *Id.* at 852.

## IV. CONCLUSION

For the stated reasons, plaintiff's motion to dismiss defendant's third and twenty-first affirmative defenses and for a declaration that there are no policy provisions that reduce the annual policy limits available to plaintiff is GRANTED IN PART and DENIED IN PART. The Deemer and One–Year Reporting clauses do not limit plaintiff's recovery under the 1964 and 1965 policies, but the

---

2. It does not matter, for example, who incurred the expense initially (thus EPA oversight costs are included) or whether the expense was mandated or not.

3. The Court does not expect the parties' written submissions to consist of scientific and exacting determinations of what is an "RI expense" and what is a "FS expense." Instead, the Court merely seeks the parties' best estimate of what percentage of a given outlay relates to remedial investigations and what percentage relates to feasibility studies, along with a basic explanation of how the percentages were derived. The parties

should focus on the *purpose* of a given expense and whether that purpose is more consistent with the general goals of remedial investigations or the general goals of feasibility studies. The Court notes that plaintiff's task essentially is complete at least in regard to the study performed at Tri–Cities—the affidavit of David Cook explains that the entire expense was primarily, if not wholly, attributable to a remedial investigation.

4. Thus the parties may find the date of a given expense helpful in determining its purpose.

Non–Cumulation clauses in the 1966–70 policies limit plaintiff's recovery to a total of $100,000 under those five policies. Finally, plaintiff's motion for an order declaring all RI/FS costs to be covered defense costs is DENIED. Plaintiff is directed to submit affidavits within fourteen (14) days of the date of this Memorandum–Decision and Order on the issue of how much the company has expended on remedial investigations versus feasibility studies, and defendant is directed to submit responsive affidavits within fourteen (14) days thereafter.

**IT IS SO ORDERED.**

Paul **BERISH**, Plaintiff,

v.

**RICHARDS MEDICAL COMPANY, n/k/a Smith & Nephew Richards, Inc.,** Defendant.

No. 94–CV–1376.

United States District Court, N.D. New York.

June 21, 1996.

Mainetti, Mainetti Law Firm, Kingston, NY (Marino D'Orazio, of counsel), for plaintiff.

Schneck, Weltman Law Firm, New York City (Glenn S. Kerner, of counsel), for defendant.

## MEMORANDUM–DECISION & ORDER

McAVOY, Chief Judge.

## I. BACKGROUND

The plaintiff, PAUL BERISH, commenced this action against the defendant, SMITH & NEPHEW RICHARDS, INC., in the New York State Supreme Court, Ulster County, on or about September 30, 1994. The plaintiff alleges claims sounding in negligence, strict products liability, and breach of express and implied warranties. These claims are made in relation to an allegedly defective femoral stem, a part of the Opti–Fix Total Hip System hip replacement device, that was implanted into the plaintiff's left hip on or about May 4, 1987.

On or about October 24, 1994, the defendant removed the action to this Court. Jurisdiction is based on diversity of citizenship. The defendant filed an Answer on November 21, 1994. The defendant filed the present motion with the Court on May 20, 1996, and such motion was ordered sealed at the parties' request on May 23, 1995.

The defendant has moved for summary judgment against the plaintiff, dismissing the Complaint in its entirety, on the grounds that all of the plaintiff's claims are barred by the doctrine of federal preemption. The defendant also seeks summary judgment as to the breach of express warranty claim on the basis that the plaintiff has failed to raise a material factual issue as to that claim. The plaintiff, of course, disagrees.

### A. Facts Relating To The Plaintiff's Alleged Injuries

The plaintiff alleges that he was implanted with a prosthetic hip replacement device, manufactured by the defendant on May 4, 1987, as treatment for a degenerative bone condition. Records show that the device was implanted without the use of bone cement.[1] The device was apparently designed for use with or without bone cement, but was at different stages of FDA approval with respect to each use.

Apparently, on or about December 19, 1993, the plaintiff experienced a fracture of the femoral stem of the hip prosthesis. Shortly thereafter, the plaintiff's prosthetic hip device was replaced. The plaintiff then filed the instant lawsuit.

### B. Facts Relating To The Device At Issue

In brief, the defendant has pursued a number of procedural measures in an attempt to secure FDA approval for the marketing of the prosthetic device at issue in this case.

---

1. The device's femoral stem was in some respect porous, so that the bone would grow securely into and around the device, obviating the need for bone cement. This is called "biological ingrowth."

The defendant submitted a so-called 510(k) Notification to the FDA stating its intent to market the hip replacement system. The 510(k) Notification permits a manufacturer to bring a device to market by demonstrating to the FDA that the device is "substantially equivalent" to one on that was on the market prior to the 1976 Medical Device Act's ("MDA") enactment. The FDA found that the defendant's device/system was substantially equivalent to other devices on the market prior to 1976, and accordingly, granted permission to the defendant to market the device subject to the general provisions of the Federal Food, Drug, and Cosmetic Act ("FDCA") and certain other controls. The May 14, 1986, letter notification from the FDA to the defendant stated that "non-cement fixation of [the] device is considered investigational and may only be investigated as a significant risk device in accordance with the investigational device exception ("IDE") regulation under 21 CFR, Part 812."

On November 7, 1986, the defendant applied to the FDA for an IDE in relation to the hip replacement prosthesis system for use without bone cement. Allegedly, the FDA gave its approval for such use of the prosthetic system on or about March 27, 1987. Subsequent to the plaintiff's operation, and on March 23, 1991, the defendant submitted a 510(k) Notification to the FDA stating its intent to market the prosthetic hip system for use without bone cement. The 510(k) Notification noted the IDE covering the system's non-cement usage.

The plaintiff argues that there is a question of fact as to whether the device at issue was subject to an IDE at the time of the surgery on May 4, 1987, and whether it is preempted by the MDA. However, the plaintiff argues that factual issues about the defendant's manufacturing process preclude the grant of defendant's summary judgment motion before even reaching the preemption issues. The Court now turns to the issues raised.

## II. DISCUSSION

### A. Standard For Summary Judgment

The standard for summary judgment is well-settled. A party seeking summary judgment must demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party bears the initial burden of "informing the ... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986), *quoting*, Fed.R.Civ.P. 56(c). The initial burden is to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554.

The nonmoving party may defeat the summary judgment motion by producing sufficient evidence to establish a genuine issue of material fact for trial. *See Id.* at 322, 106 S.Ct. at 2552. The test for existence of a genuine dispute is whether a reasonable juror could find for the nonmoving party; that is, whether the nonmovant's case, if proved at trial, would be sufficient to survive a motion for judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986).

In ruling on a motion for summary judgment, a Court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs.*, 834 F.2d 54, 57 (2d Cir.1987). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Indeed, the nonmoving party's opposition may not rest on mere allegations or denials of the moving party's pleading, but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). "The non-movant cannot escape summary judgment merely by vaguely asserting the existence of some unspecified disputed material

facts, or defeat the motion through mere speculation or conjecture." *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (citations and quotations omitted). With these standards in mind, the Court now turns to the issues presented.

## B. Preemption As To The Strict Products Liability Claim And The Negligent Design Claim

### 1. Legal standards relating to preemption

■ Federal law is "... the supreme Law of the Land; and [ ] the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State notwithstanding." U.S. Const. art. VI, cl. 2. Accordingly, any state law that conflicts with federal law may be preempted. *Malone v. White Motor Corp.*, 435 U.S. 497, 504–05, 98 S.Ct. 1185, 1189–90, 55 L.Ed.2d 443 (1978). However, state law will not be preempted unless preemption "was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Congress may express its intent to preempt state law in two ways: (1) *implicitly*, by passing a statutory scheme that fully occupies the relevant field of regulation, *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982), or (2) *expressly*, by stating its intent to preempt in the language of a statute. *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309–10, 51 L.Ed.2d 604 (1977).

■ Congress expressed its intent to preempt state law by enacting the MDA, the statute at issue in this analysis, by stating:

[N]o State or political subdivision of a State may establish or continue in effect with respect to a device intended for human use any requirement—(1) which is different from, or in addition to, any requirement applicable under this Act to the device, and (2) which relates to the safety or effectiveness of the device or to any other matter included in a requirement applicable to the device under this Act.

21 U.S.C. § 360k(a). Moreover, under the MDA, medical device manufacturers must register each device with the FDA before beginning manufacture. *Martello v. Ciba Vision Corporation*, 42 F.3d 1167, 1168 (8th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 2614, 132 L.Ed.2d 857 (1995); 21 U.S.C. § 360c. "After registration, the FDA classifies each device according to the level of regulatory control necessary to provide for the device's safety and effectiveness." *Martello*, 42 F.3d at 1168. Class I devices present the least risk of harm and are the most loosely regulated; Class II devices are more heavily regulated; and Class III devices, such as the Ligament, are the most heavily regulated and must pass premarket approval. *See id.*; 21 U.S.C. § 360c(a)(1). When a device has been approved, the manufacturer must maintain certain records and continue to report to the FDA about the device. *See* 21 U.S.C. § 360i. Thus, it is clear that the MDA preempts state law as to certain medical devices.

