

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-25-1999

# Chemical Leaman v. Aetna Cslty & Surety

Precedential or Non-Precedential:

Docket 97-5735,97-5736

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Chemical Leaman v. Aetna Cslty & Surety" (1999). *1999 Decisions.* Paper 144.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/144

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed May 25, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NOS. 97-5735 and 97-5736

CHEMICAL LEAMAN TANK LINES, INC.,

      Appellant in No. 97-5735

v.

THE AETNA CASUALTY AND SURETY COMPANY, and
CERTAIN UNDERWRITERS at LLOYDS, LONDON
Subscribing to Insurance Policies Numbers WAR 6771,
WAR 6772/A C62P 10-117, L62P 10-117, 64P 3-121,
L64P 3-121A, L64P 3-121B, C64P 3-121B, C65P 5-119,
C65P 5-119A, L65P 5-119A, L66P 5-119A, C67P 4-158,
L67P 4-158, C68P 2-116, L68P 2-116, C68P 2-116A,
C68P 2-116B, L68P 2-116A, L68P 2-116B, C71-03-03-13,
L71-03-03-13, C71-03-03-13A, C71-03-03-13B,
L71-03-03-13A, L71-03-03-13B, C74-03-18-02,
77-01-19-23, 77-01-19-23A, C77-01-19-23B, 79-04-19-10,
C80-02-19-09, C80-02-19-09B, L80-02-09A,
L80-02-19-09A, L80-02-19-09B, C83-02-19-09,
L83-02-19-09A, L83-02-19-09B, L83-02-19-09C

CHEMICAL LEAMAN TANK LINES, INC.

v.

AETNA CASUALTY AND SURETY COMPANY; ROBIN
ANTHONY GILDART JACKSON, an Underwriter at Lloyds,
London, individually and in his capacity as representative
Underwriter at Lloyds, London for certain subscribing
Underwriters at Lloyds, London who subscribed to certain
liability insurance policies issued to plaintiff Chemical
Leaman Tank Lines, Inc.; ACCIDENT AND CASUALTY
COMPANY OF WINTERTHUR, (now known as Winterthur
Swiss Insurance Company); ALBA GENERAL INSURANCE
COMPANY LTD.; ALLIANZ CORNHILL INTERNATIONAL

INSURANCE, PLC (formerly known as Allianz International Insurance Company Ltd.); ARGONAUT NORTHWEST INSURANCE COMPANY; ASSICURAZIONI GENERALI SPA; BALOISE FIRE INSURANCE COMPANY; BELLEFONTE INSURANCE COMPANY LTD.; CNA INTERNATIONAL REINSURANCE CO. LTD. (formerly known as CNA Reinsurance of London Company Ltd.); DELTA LLOYD NON-LIFE INSURANCE COMPANY; DOMINION INSURANCE COMPANY LTD.; DRAKE INSURANCE COMPANY LTD. (now known as Sphere Drake Insurance plc); EXCESS INSURANCE COMPANY LTD.; FIDELIDADE INSURANCE COMPANY; GAN MINSTER INSURANCE COMPANY LTD. (formerly known as Minster Insurance Company Ltd.); HELVETIA ACCIDENT SWISS INSURANCE COMPANY (now known as ELVIA Swiss Insurance Company Ltd.); LONDON AND EDINBURGH INSURANCE COMPANY, LTD.; NATIONAL CASUALTY COMPANY; NATIONAL CASUALTY INSURANCE OF AMERICA, LTD.; NEW LONDON REINSURANCE COMPANY, LTD. (now known as NRG Victory Reinsurance Ltd.); RIVER THAMES INSURANCE COMPANY LTD.; SCOTTISH LION INSURANCE COMPANY; SPHERE INSURANCE COMPANY LTD., (now known as Sphere Drake Insurance plc); ST. PAUL INTERNATIONAL INSURANCE COMPANY LTD. (formerly known as St. Katherine Insurance Co. Ltd.); SWISS UNION GENERAL INSURANCE COMPANY LTD.; MITSUI MARINE & FIRE INSURANCE COMPANY (EUROPE) LTD. (formerly known as Taisho Marine & Fire Insurance Company (U.K.) Ltd.); TOKIO MARINE & FIRE INSURANCE COMPANY (U.K.) LTD.; TUREGUM INSURANCE COMPANY; UNIONAMERICA INSURANCE COMPANY LTD.; WORLD AUXILIARY INSURANCE CORPORATION LTD.; YASUDA FIRE & MARINE INSURANCE COMPANY OF EUROPE LTD., (formerly known as Yasuda Insurance Company (U.K.) Ltd.) (hereafter collectively referred to as "Jackson & Companies"),

Appellants in No. 97-5736

On Appeal From the United States District Court For the District of New Jersey

2

(D.C. Civil Action No. 89-cv-01543)
District Judge: Hon. Stanley S. Brotman

Argued September 15, 1998

BEFORE: STAPLETON and ROTH, Circuit Judges, and
LONGOBARDI,* District Judge

(Opinion Filed May 25, 1999)

        Kevin B. Clark
        John P. Dean (Argued)
        Conrad J. Smucker
        Lisa K. Coleman
        Willkie Farr & Gallagher
        Three Lafayette Centre
        1155 21st Street, N.W.
        Washington, D.C. 20036-3384

         Attorneys for Chemical Leaman
         Tank Lines, Inc., Appellant in No.
         97-5735

        Henry Lee (Argued)
        Olympia Bizekis
        Allen R. McKay
        Mendes & Mount
        750 Seventh Avenue
        New York, NY 10019
         and
        William S. Wachenfeld
        Adam M. Smith
        Mendes & Mount
        One Newark Center
        Newark, NJ 07102

         Attorneys for Robin Anthony
         Gildart Jackson, et al., Appellants
         in No. 97-5735
_____

*Honorable Joseph J. Longobardi, Senior United States District Judge for
the District of Delaware, sitting by designation.

          Laura A. Foggan
          Elizabeth A. Eastwood
          Peter J. Skalaban, Jr.
          Wiley, Rein & Fielding
          1776 K Street, N.W.
          Washington, D.C. 20006

           Attorneys for Insurance
           Environmental Litigation
           Association, Amicus Curiae

OPINION OF THE COURT

STAPLETON, Circuit Judge:

I.

This appeal marks the second appearance of this case before our Court and comes after more than nine years of litigation.[1] Seeking indemnification for costs connected to the environmental cleanup of its Bridgeport, New Jersey, facility, Chemical Leaman initially filed this declaratory judgment and damages action against its primary and excess insurers in April, 1989.

Chemical Leaman is a tank truck company specializing in the transportation of various chemicals and other liquids. Since 1960, it has provided tank truck cleaning services at its Bridgeport truck terminal facility. In 1969, the New Jersey Department of Health ordered Chemical Leaman to

---

1. A more detailed history of this case is found in the prior published opinions. The District Court's pre-trial opinions are reported at Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 788 F.Supp. 846 (D.N.J. 1992) and Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F.Supp. 1136 (D.N.J. 1993). Our initial opinion in this case was vacated on a petition for rehearing en banc. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 68 F.3d 658 (3d Cir. 1995), vacated 68 F.3d 685 (3d Cir. 1995). Our subsequent opinion is published at 89 F.3d 976 (3d Cir. 1996). The District Court's opinion following remand is reported at Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 978 F.Supp. 589 (D.N.J. 1997).

4

construct a waste water treatment and/or disposal plant to alleviate the strong odors emanating from the on-site ponds and lagoons where Chemical Leaman disposed of water from the cleaning process. Chemical Leaman continued to use the ponds and lagoons system until it installed a water treatment system in 1975. By 1977, Chemical Leaman had drained and filled the ponds and lagoons.

In 1981, the New Jersey Department of Environmental Protection ordered Chemical Leaman to investigate the extent and degree of groundwater contamination at and around the Bridgeport site. The investigation revealed that the ponds and lagoons were primary sources of groundwater contamination. In 1984, the federal Environmental Protection Agency ("EPA") placed the Bridgeport site on the National Priorities List of Superfund sites pursuant to Section 105 of the Comprehensive Environmental Response, Compensation and Liabilities Act ("CERCLA"), 42 U.S.C. S 9605. The EPA alleged that Chemical Leaman was strictly liable for injury to, destruction of, or loss of natural resources, as well as the reasonable costs of assessing such damage to natural resources, and for all costs of removal or remedial action incurred by the United States or the State of New Jersey.

In July 1985, Chemical Leaman entered into a consent order with the EPA, admitted liability under CERCLA, and agreed to remediate the Bridgeport site or pay for its remediation. Additionally, this order directed Chemical Leaman to undertake a Remedial Investigation and Feasibility Study ("RI/FS") of the groundwater. Chemical Leaman has incurred substantial costs in conducting this study and expects to accrue considerable future removal costs and damages.

After entering this consent order, Chemical Leaman notified its various insurers. Chemical Leaman had purchased comprehensive general liability ("CGL") policies from Aetna, its primary insurer, for one-year periods covering April 1, 1959, through April 1, 1985. Under these policies, Aetna agreed to pay on behalf of Chemical Leaman all sums that Chemical Leaman became legally obligated to pay as damages because of property damage. Additionally, Aetna agreed to defend Chemical Leaman in suits seeking

5

recovery for such property damage. From April 1, 1971, through April 1, 1985, Aetna's policies contained a pollution exclusion, indicating that the policies did not apply to the discharge of pollutants unless such discharge was "sudden and accidental." Chemical Leaman had also purchased multi-year excess liability insurance policies through Lloyd's insurance market spanning the period April 1, 1958, through April 1, 1986. These excess policies covered property damage but did not contain a similar defense obligation. The excess policies covering April 1, 1971, through April 1, 1985 contained pollution exclusions similar to those in Aetna's CGL policies.

When these insurers denied coverage, Chemical Leaman, a Delaware corporation with its principal place of business in Pennsylvania, filed suit against Aetna, a Connecticut corporation with its principal place of business in Connecticut, and "Certain Underwriters at Lloyd's, London subscribing to Insurance Policies [specifically enumerated]." (LMIa47) The complaint claimed that diversity jurisdiction was proper and alleged that "Certain Underwriters" were "various insurance companies organized and existing under the laws of the United Kingdom." (LMIa48)

On August 9, 1989, the parties stipulated to a change in the complaint "substitut[ing] `Robin Anthony Gildart Jackson, an Underwriter at Lloyd's, London on behalf of himself and all other Underwriters at Lloyd's, London, subscribing to [specifically enumerated policies], [and forty specifically named insurance companies]' in place of and instead of defendants `Certain Underwriters at Lloyd's, London subscribing to Insurance Policies [specifically enumerated].' " (LMIa57-59) The stipulation stated that any final judgment against Jackson would be binding on those underwriters subscribing to the enumerated policies and thus within the scope of Jackson's purported representation. In a similar vein, the stipulation indicated that a final judgment in favor of Jackson would inure to the benefit of those same underwriters.2  Jackson, the

_____

2. The amended stipulation also included several additional policies within the scope of Jackson's purported representation and stated that these underwriters would be bound or benefitted by a final judgment for or against Jackson.

underwriters he is alleged to represent, and the specifically named insurance companies are underwriters of Chemical Leaman's various excess policies purchased through Lloyd's insurance market. This stipulation was signed by the attorneys for Chemical Leaman, Jackson, and the named insurance parties. On August 29, 1989, the District Court entered an order amending the complaint and designating Jackson and the named insurance companies (hereinafter collectively "the excess insurers") as defendants.

Following extensive discovery, the parties filed cross-motions for summary judgment on various grounds. The District Court held that New Jersey law governed the insurance policies at issue. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 788 F.Supp. 846, 850–51 (D.N.J. 1992). The primary and excess insurance policies were standard form "occurrence–based" policies, meaning that they insured against "occurrences" as defined in the policies. The District Court concluded that Chemical Leaman bore the burden of proving an occurrence. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 817 F.Supp. 1136, 1143–44 (D.N.J. 1993). And because Chemical Leaman's insurance policies defined "occurrence" as an event neither expected or intended, the Court concluded that Chemical Leaman also had to prove that it did not subjectively expect or intend the property damage for which it sought coverage. See id. at 1144.3

Furthermore, the District Court concluded that, under New Jersey law, the "continuous trigger" theory of liability would apply and trigger a particular insurance policy if (1) damage took place during that policy year; and (2) the damage in that policy year was part of a continuous and indivisible process. See id. at 1153–54. At the time of trial, New Jersey's continuous trigger law indicated that

_____

3. The pre–1961 policies insured against "accidents" as opposed to "occurrences." New Jersey law defines the term "accident" in the accident-based policies in substantially the same manner as the definition of an "occurrence" in the occurrence-based policies--an event neither expected nor intended by the insured. Thus, the District Court concluded that Chemical Leaman bore the same standard of proof under both types of policies. See 817 F.Supp. at 1148. The insurers did not challenge that holding on appeal. See 89 F.3d at 982 n.2.

insurance policies so triggered were jointly and severally liable to policy limits for all damages resulting from that occurrence, including damages that occurred before and after the policy period. See id. at 1153. Because Chemical Leaman began depositing contaminants into the ponds in 1960 and did not contest the insurer's assertion that the contamination began to migrate to the groundwater immediately, the District Court ruled as a matter of law that damage had occurred to the soil and groundwater in the 1960-1961 policy year. See id. at 1148. The District Court did not discuss whether the same contamination immediately spread to the wetlands.

Once a policy was deemed triggered, the District Court concluded, the insurers bore the burden of proving that coverage was precluded by an applicable pollution exclusion. See id. at 1157. Finding the record replete with evidence that Chemical Leaman intended to discharge pollutants into the soil at the Bridgeport site, the Court granted summary judgment under the pollution exclusion to the insurers on Chemical Leaman's claims for soil damage after April 1, 1971. See id. The District Court denied summary judgment under the pollution exclusion with respect to groundwater contamination, and did not address contamination to the surrounding wetlands. See id.

Based on the District Court's legal conclusions, the jury was asked to respond to a series of special interrogatories.[4] The jury found that property damage had occurred to the soil in every policy year between April 1, 1961 to April 1, 1971;[5] to the groundwater in every policy year between April 1, 1961, to April 1, 1981;[6] and to the wetlands in

_____

4. Chemical Leaman originally sought coverage from its insurers under the policies covering years 1960-1985. As we noted in our first opinion, the parties appear to agree that Chemical Leaman dismissed its claims under the 1981 to 1985 policies. See 89 F.3d at 983 n.4.

5. Because of the District Court's determination that the pollution exclusion barred coverage for soil damage after 1971, the jury was not asked to determine whether soil damage occurred after that time. Additionally, as noted above, the District Court had previously found that soil damage occurred in the 1960-1961 policy year.

6. The District Court had already concluded that groundwater damage occurred in the 1960-1961 policy year.

8

every policy year between April 1, 1961, to April 1, 1978.7 For every year in which property damage to a particular medium occurred, the jury also found that (1) the damage was part of a continuous and indivisible process; and (2) Chemical Leaman did not expect or intend to cause that damage at the time that it occurred. Furthermore, the jury found that Chemical Leaman did not intend or expect to discharge pollutants into the groundwater between 1971 and 1981, but did find that Chemical Leaman intended and expected to discharge pollutants into the wetlands between 1971 and 1978.

Based on its own legal conclusions and the jury's verdict, the District Court issued a judgment order on April 7, 1993. This order proclaimed that Chemical Leaman was entitled to recover "the full amount of any and all costs of investigating and remediating" soil, groundwater, and wetlands contamination at Bridgeport. (JA30-32) Moreover, the order provided that the 1960-71 Aetna and excess insurance policies were jointly and severally liable up to their policy limits for investigation and remediation costs connected to soil contamination; that the 1960-81 policies were jointly and severally liable up to policy limits for groundwater contamination; and the 1961-71 policies were jointly and severally liable up to policy limits for wetlands contamination.

Aetna and the excess insurers appealed to this Court. Following oral argument but before we issued our decision, Chemical Leaman entered into a settlement agreement with Aetna. In this agreement, Aetna agreed to pay Chemical Leaman $11,500,000 to settle Chemical Leaman's claims against Aetna based on its 1959 to 1985 CGL policies. This agreement purported to settle not only Chemical Leaman's claim for damages and indemnification related to the Bridgeport site but also its claims against Aetna involving numerous other contaminated sites.8 Chemical Leaman and

_____

7. The jury specifically found that no property damage occurred to the wetlands in the 1960-1961 policy year or in the 1978-1981 policy years.

8. On October 6, 1994, Aetna had filed a declaratory judgment action against Chemical Leaman and Chemical Leaman's excess insurers in the United States District Court for the Eastern District of Pennsylvania.

Aetna allocated the $11,500,000 settlement amount among the various contamination sites; $5,226,750 was allocated to Bridgeport.9 Moreover, Chemical Leaman and Aetna agreed that this settlement exhausted Aetna's CGL policies covering April 1, 1959, to April 1, 1985. Because of the settlement, Aetna withdrew from the appeal and is no longer a party to the dispute.

On June 20, 1996, a panel of this Court affirmed the District Court's judgment "except as to the allocation of liability." (JA98-99) We remanded with instructions that the District Court reallocate the damages "among applicable polices in accordance with the New Jersey Supreme Court's holding in [the intervening case] Owens-Illinois [v. United Insurance Co.], 650 A.2d 974, 993-995 (N.J. 1994)." (JA99) In Owens-Illinois, the New Jersey Supreme Court addressed the allocation of liability when the continuous trigger theory established the time of an occurrence as spread over a series of years. The New Jersey Supreme Court rejected joint and several liability and instead held that"any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure[to injurious conditions]. . . . i.e., proration on the basis of policy limits, multiplied by years of coverage." Id. at 993.

On remand, the District Court heard oral argument and accepted briefs on the reallocation of damages. As a threshold matter, the District Court concluded that all of Chemical Leaman's costs associated with the government-

_____

Aetna Casualty & Surety Co. v. Chemical Leaman Tank Lines, Inc., No. 94-CV-6133 (E.D. Pa.). Aetna's complaint enumerated various contamination sites for which Chemical Leaman had requested coverage and alleged that it had no duty to defend or indemnify Chemical Leaman for any claims arising out of these sites. Chemical Leaman counterclaimed against Aetna and alleged that Aetna's policies did provide coverage for all of the relevant claims. On July 17, 1995, the District Court suspended the Pennsylvania litigation pending the outcome of the instant case.

9. The amount allocated to each site was determined by estimating the cleanup costs by site, calculating each site's percentage of the total estimated cleanup cost, and then multiplying this percentage by the settlement amount.

mandated RI/FS were indemnity costs, rather than defense costs, and thus subject to recovery under the excess insurance policies. See Chemical Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co., 978 F.Supp. 589 594-96 (D.N.J. 1997). Analyzing the effect of Aetna's settlement on the allocation of liability, the District Court concluded that Aetna's CGL policies had been exhausted by the settlement. See id. at 600-01. As a result, the District Court concluded that Aetna's policies and their limits should not be included in its subsequent reallocation of liability pursuant to Owens-Illinois. See id. at 604. Nonetheless, the District Court concluded that the excess insurers were entitled to a credit of $11,055,000, an amount reflecting Aetna's 1960-1981 per-occurrence policy limits. See id. at 601-03. The District Court also determined that this Court's earlier opinion precluded any allocation of liability related to soil and wetlands back to Chemical Leaman based on the liability-phase determinations that pollution exclusion clauses in the 1971-1981 policies barred coverage for soil and wetland coverage in those years. See id. at 603.

Because the District Court calculated the total Bridgeport past indemnity costs as $11,084,226, see id. at 597-98, the District Court concluded that the excess insurers were responsible for $29,226, the past indemnity costs over and above the $11,055,00 credit, and all future indemnity costs associated with Bridgeport. See id. at 602. The District Court determined that the $29,226 in remaining past costs constituted costs attributable to groundwater. See id. at 610.

The District Court then set about allocating the relevant indemnity costs among the excess insurers. In accord with its earlier holdings, the District Court concluded that all future soil indemnity costs associated with Bridgeport would be allocated among the 1960-71 policy years; that $29,226 and all future groundwater indemnity costs would be allocated among the 1960-81 policy years; and that all future wetlands indemnity costs would be allocated among the 1961-71 years. See id. at 605. The District Court assigned a percentage of the liability for each medium to each policy year deemed liable for that particular medium. The District Court calculated these percentages by adding

11

up the policy limits of all the excess policies in a particular policy year and dividing that amount by the total policy limits of all excess policies in all policy years deemed liable for that medium. See id. at 605–06; 610–12. 10 Because several layers of excess policies overlay the Aetna primary policy in each policy year, the District Court directed that each layer of excess coverage in a given year must exhaust before the next layer of excess insurance would be required to begin paying indemnity costs to Chemical Leaman. See id. at 606.11

Because a single per-occurrence limit existed in each excess insurance policy sold through Lloyd's, even those policies with terms greater than one year, the District Court was required to address whether the Bridgeport contamination should be treated as one occurrence or a separate occurrence in each policy year. The District Court held that the policies of greater than one year would be liable up to the per-occurrence limit for a separate occurrence during each policy year. See id. at 608. As a final matter, the District Court found that each underwriter of the excess insurance policies sold through Lloyd's was independently liable for its own share of that policy, and thus that defendant underwriters should not bear the loss of insolvent underwriters or underwriters not named as defendants in the action. See id. at 608–09.

Both Chemical Leaman and the excess insurers appeal the District Court's order on remand. The excess insurers appeal the District Court's determination that all of costs associated with the government-mandated RI/FS are indemnity costs subject to recovery under the excess insurance policies rather than defense costs. Additionally, the excess insurers contend that the District Court erred by

_____

10. For example, the total excess coverage in policy years 1960–1971 was $131,225,000. Because the excess policies in 1960 offered $1,225,000 in coverage, the District Court assigned 0.93% ($1,225,000/$131,225,000) of all future soil indemnity costs to the policies in 1960.

11. This vertical allocation, beginning with the lowest policy layer and proceeding upward through each succeeding policy layer in a particular year, was subsequently adopted by the Supreme Court of New Jersey in Carter-Wallace, Inc. v. Admiral Ins. Co., 712 A.2d 1116 (N.J. 1998).

allocating all indemnity costs related to the soil and wetlands to the excess insurers rather than requiring Chemical Leaman to absorb a portion of these costs based on the applicable pollution exclusion after 1971. Chemical Leaman challenges the District Court's award of an $11,055,000 settlement credit to the excess insurers rather than a lesser credit of $5,226,750, the amount Chemical Leaman allocated to Bridgeport in its settlement agreement with Aetna.

## II. EXISTENCE OF SUBJECT MATTER JURISDICTION

Prior to the entry of a final order in the District Court, the excess insurers brought the attention of the Court to Lowley-Williams v. North River Ins. Co., 884 F. Supp. 166 (D.N.J. 1995), a declaratory judgment action brought by a Lloyd's underwriter in which the Court held that the citizenship of all underwriters on a Lloyd's policy had to be taken into account in determining diversity jurisdiction. The excess insurers simultaneously informed the Court that there were underwriters who subscribed to Chemical Leaman's excess policies who were residents of Pennsylvania and Delaware. However, neither the excess insurers nor any other party took the position that the District Court lacked subject matter jurisdiction. The District Court apparently concluded before entering its judgment that it had diversity jurisdiction.

Before us, all parties affirm that the District Court had diversity jurisdiction under 28 U.S.C. S 1332 and that we have appellate jurisdiction under 28 U.S.C. S 1291. We have conducted our own inquiry, however, as to whether the subject matter jurisdiction of the District Court can be questioned at this stage of the proceedings and, if so, whether it had diversity jurisdiction.

## A. No Bar To Judicial Consideration of this Issue

The first issue we face is whether the existence of subject matter jurisdiction is an issue open to judicial consideration at this procedural juncture. The general rule is that "where non-waivable subject matter jurisdiction is lacking but not raised, a final judgment has res judicata

13

effect in a subsequent proceeding, and a collateral attack based on the want of subject matter jurisdiction is barred." Mitchell v. Commission on Adult Entertainment Establishments, 12 F.3d 406, 408-09 (3d Cir. 1993) (citing Hodge v. Hodge, 621 F.2d 590, 592 (3d. Cir. 1980)). This rule applies whether or not the issue of subject matter jurisdiction was litigated. See id. The logical corollary to this general rule is the rule that as long as a case is pending, the parties or the court on its own motion may raise the issue of federal court jurisdiction at any stage of the proceedings. See Depex Reina 9 Partnership v. Texas International Petroleum, 897 F.2d 461, 464 (10th Cir. 1990) (citing 1 Moore's Federal Practice P 0.60[4] (2d ed. 1981)). Specifically, if there is no final judgment outstanding into which the defense of lack of jurisdiction can merge and proceedings are continuing, res judicata does not operate to bar consideration of a challenge to the jurisdiction of the court. See id.; DeNafo v. Finch, 436 F.2d 737, 740 (3d Cir. 1971).

In this case, the District Court entered a final declaratory judgment declaring each primary and excess insurer that provided coverage to Chemical Leaman during the relevant periods jointly and severally liable in accordance with the limits of its policy for the entire amount of investigation and remedial costs incurred in connection with the Bridgeport site. On appeal from this judgment, our opinion stated that "[the excess insurers] correctly dispute the district court's holding that all policies are jointly and severally liable." Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co. , 89 F.3d 976, 995 (3d Cir. 1996). The opinion concludes by saying:

> For the foregoing reasons, we will affirm the district court except as to the allocation of liability among applicable policies. We will remand to the district court for a reallocation of damages among applicable policies in accordance with the New Jersey Supreme Court's holding in Owens-Illinois, 650 A.2d at 993-95.

Id. at 997.

While our opinion said we were affirming the "district court," the Clerk's Office's mandate stated the District

14

Court's "judgment" was being affirmed in some respects and not in others:

> On consideration whereof, it is now here ordered and adjudged by this Court that the judgment of the said District Court entered November 18, 1993, be, and the same is hereby affirmed except as to the allocation of liability among applicable policies and the cause is remanded to the District Court for a reallocation of damages among applicable policies in accordance with the New Jersey Supreme Court's holding in Owens-Illinois, 650 A.2d 974, 993-95 (N.J. 1994). All of the above in accordance with the opinion of this Court."

(JA98-99)

Although our mandate should have stated that the judgment of the District Court was reversed and that the matter was remanded for further proceedings and the entry of a corrected declaratory judgment, the language chosen by the clerk must be construed in the context of our opinion to mean the same thing. The District Court's judgment was clearly not a valid and enforceable judgment following our action on appeal.

It is important to note that subject matter jurisdiction was not an issue litigated in the first district court proceeding. When an appellate court approves something the district court has done and not others, issue preclusion does foreclose further consideration of an issue on which the district court has been "affirmed." However, the doctrine of claim preclusion bars consideration of an issue not litigated below only if there exists a valid, enforceable judgment into which a claim or defense has merged. We do not have one here. See International Telephone & Telegraph Corp. v. General Telephone & Electronics Corp., 527 F.2d 1162 (4th Cir. 1975) (noting that because Court of Appeals reversed judgment in part, no final judgment existed on which defendant could advance res judicata defense).

We are aware that Chemical Leaman terms the proceedings on remand as supplemental proceedings after the issuance of a final declaratory judgment. This is a reference to 28 U.S.C. S 2202. Section 2202 provides that "[f]urther necessary or proper relief based on a declaratory

15

judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment." As Wright and Miller note, Section 2202 "permits the original [declaratory] judgment to be supplemented either by damages or by equitable relief " [even] "long after the declaratory judgment has been entered, provided that the party seeking relief is not barred by laches." 10B C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE & PROCEDURE [hereinafter WRIGHT &MILLER] S 2271 at 682 (3d ed. 1998). Chemical Leaman's view of the procedural posture of this action is incorrect. The reallocation of liability on remand is part of the declaration of the "rights and other legal relations" of the parties before the court, 28 U.S.C. S 2201, while a motion to recover amounts due in accordance with the declaration would constitute supplementary relief. See WRIGHT & MILLER S 2771, at 682 (supplemental relief, such as damages or an injunction, available against parties "whose rights have been determined").

Because we find no bar to our consideration of the propriety of subject matter jurisdiction, we now examine whether a proper basis exists.

B. Diversity Jurisdiction

When this action was commenced, district courts had original subject matter jurisdiction where the matter in controversy exceeded $10,000 and was between citizens of different States, or between citizens of a State and citizens of a foreign state. See 28 U.S.C. S 1332.12 Though not constitutionally required, the Supreme Court has long insisted, as a matter of statutory interpretation, that complete diversity between plaintiffs and all defendants exist. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267 (1806).

An understanding of Lloyd's is helpful at the outset. Our information concerning Lloyd's comes from the stipulation
_____

12. The effective date of the 1988 amendment raising the jurisdictional amount to $50,000 was May 18, 1989. Because this action was filed on April 12, 1989, the $10,000 jurisdictional amount applies.

16

of the parties filed in Lowsley-Williams and relied upon by the parties here. Lloyd's is an association that provides the physical premises and the administrative services and staff to enable insurance underwriters to carry on their business. Lloyd's is not an insurance company, but rather is an exchange or market where various individuals or groups bid on the right to insure a given risk. Lloyd's takes no part in the business of underwriting; policies are underwritten at Lloyd's and not by Lloyd's.

An individual must pay a membership fee, keep certain deposits at Lloyd's, and meet several specific requirements, including possession of a certain degree of wealth, in order to have access to the Lloyd's insurance market. Once they have joined the market, these individuals may underwrite risks in this market. The individuals are alternatively referred to as members, underwriters, or names. In order to increase the efficiency of underwriting risks and to combine the resources of numerous individuals, names form groups called syndicates. However, syndicates are not legal entities. Syndicates do not assume liability or underwrite risks; names do. Each name has unlimited personal liability yet only to the extent of the percentage share of the risk that he or she has assumed. The holders of Lloyd's policies thus enter into contractual relationships with specific names who have subscribed to the policy for the portion of the risk each name has agreed to underwrite.

Within each syndicate, a Managing Agent is responsible for the underwriting and management of each individual's investments. The Managing Agent receives this authority through contracts with each individual. The Managing Agent, typically a partnership or limited company, appoints one of its employees to serve as the Active Underwriter for the syndicate. The Active Underwriter has the authority to bind all the individuals in the syndicate. The Active Underwriter selects the risks to underwrite, determines the conditions to which a risk will be subject, assigns each individual in the syndicate a percentage of the risk, and decides whether to pay a particular claim.

The complaint originally filed in this case designates as parties defendant Aetna and the underwriters at Lloyd's who subscribed to Chemical Leaman's excess policies. It

17

alleges that each of these parties has agreed to submit to the jurisdiction of any court of competent jurisdiction in the United States and has designated Mendes and Mount in New York as its agent for service of process.

As we have noted, however, Chemical Leaman agreed early in the litigation to amend its complaint. The Amended Complaint designates as defendants Aetna, forty insurance companies identified by name, and "Robin Anthony Gilbert Jackson, an Underwriter at Lloyd's, London on behalf of himself and all other underwriters at Lloyd's, London subscribing to" Chemical Leaman's excess policies. The parties agree that there is complete diversity between Chemical Leaman, Aetna, the forty named insurers and Jackson.13 A jurisdictional problem would exist only if this Court were required to consider the citizenship of the underwriters within Jackson's purported representation. Given the complaint before us, we are not so compelled.

Chemical Leaman has not brought suit against Jackson as an agent of the individual underwriters or against the syndicates of which they are members. There are no allegations in the amended complaint to support such theories.14 The amended complaint is based solely on the

_____

13. While the parties agree that neither Jackson nor the named insurance policies have the same citizenship as Chemical Leaman, the complaint, as amended pursuant to the stipulation, does not so allege. The plaintiff has the burden of pleading the existence of the court's jurisdiction, see Fed.R.Civ.P. 8, and, in a diversity action, the plaintiff must state all parties' citizenships such that the existence of complete diversity can be confirmed. See 5 Wright & Miller S 1208, at 100 (2d ed. 1990). We are authorized to permit Chemical Leaman to amend its complaint to make the necessary allegations by statute. See 28 U.S.C. S1653 ("Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."). We have previously stated: "It is not only within the power, but it is a duty, of a federal court to consider on the merits a proposed amendment of a defective allegation once the court's attention is called to the defect." See Kiser v. General Electric Corp., 831 F.2d 423, 427 (3d Cir. 1987). Accordingly, we instruct Chemical Leaman to remedy its inadequate jurisdictional allegations.

14. Chemical Leaman's complaint cannot reasonably be read as asserting a claim against an individual underwriter as an agent for his syndicate. Compare Certain Interested Underwriters at Lloyd's v. Lane, 26 F.3d 39 (6th Cir. 1994). Nor can it be reasonably read as asserting a claim against a syndicate itself. Compare Indiana Gas Co., Inc. v. Home Ins. Co., 141 F.3d 314 (7th Cir. 1998).

excess policies and the underwriter names share no common liability under those policies. The only relevant allegation is that Jackson subscribed to the excess policies in the same manner as all other subscribers, i.e., that he is a member of a class of similarly situated persons. Thus, while Jackson is sued "on behalf of . . . all other Underwriters at Lloyd's, London subscribing to" the excess policies, the amended complaint identifies no basis for binding "all other underwriters" absent a class certification.

There has been no class certification here. Accordingly, the only claim against Jackson that the District Court could adjudicate was the claim against him in his individual capacity. See Davis v. Romney, 490 F.2d 1360 (3d Cir. 1973) (treating the action as an individual claim in the absence of class certification); Jackson v. O'Bannon, 633 F.2d 329 (3d Cir. 1980) (concerning itself only with the factual situation involving the named parties since the purported class had not been certified and neither party raised the class issue on appeal).15

Because Aetna, Jackson and the named insurance companies were the only defendants after the complaint was amended, only their citizenship and liability amounts on the insurance policies are relevant to the exercise of subject matter jurisdiction under 28 U.S.C. S 1332. In reaching this conclusion, we are not unmindful of the fact that Chemical Leaman and the underwriters of the excess policies have agreed in their stipulation to be bound by the judgment in this action for or against Jackson. However, this stipulation did not place before the District Court any of the underwriters not named in the amended complaint, and the judgment of the District Court is not directly enforceable by or against them. Accordingly, we do not view this voluntary side agreement as depriving the District Court of its jurisdiction.16

_____

15. If the District Court had properly certified a class, the existence of complete diversity would be determined without reference to the citizenship of the members of the class other than Jackson and the named insurance companies. See In Re School Asbestos Litigation, 921 F.2d 1310 (3d Cir. 1990).

16. Chemical Leaman states a valid claim against Jackson as an underwriter of one or more of its Lloyd's policies. This, accordingly, is

19

III. CHARACTERIZATION OF RI/FS COSTS AS DEFENSE
     OR INDEMNITY COSTS

Turning to the propriety of the District Court's order on
remand, we examine the District Court's determination that
all of Chemical Leaman's mandated RI/FS investigation and
remediation costs are indemnity costs rather than defense
costs. Because the excess insurance policies carry only a
duty to indemnify, and not a corresponding duty to defend,
the excess insurers would necessarily benefit from a partial
allocation of the RI/FS costs to defense costs.[17]

_____

not a situation in which diversity jurisdiction has been manufactured to
secure an adjudication of a controversy over which a district court would
not otherwise have diversity jurisdiction. See 28 U.S.C. S1359 ("A
district
court shall not have jurisdiction of a civil action in which any party by
assignment or otherwise, has been improperly or collusively made or
joined to invoke the jurisdiction of such court."); Boyer v. Snap-On Tools
Corp., 913 F.2d 108 (3d Cir. 1990) (noting that court will abide by
plaintiff 's election of defendants unless the plantiff impermissibly
manufactured diversity or used an acceptable device to defeat diversity);
McSparran v. Weist, 402 F.2d 867 (3d Cir. 1968) ("manufactured"
diversity of citizenship, by appointment of out-of-state guardian to
prosecute suit of resident minor, did not constitute adequate foundation
for federal jurisdiction).

Moreover, we perceive no reason why Chemical Leaman should not be
entitled to sue less than all of the names if it so chooses. According to
the terms of the Lloyd's policies, the names are liable "each for his own
part and not one for another." See 978 F.Supp. at 609 (quoting policy
language). Thus, while the absent names would be proper parties to this
suit, they are not necessary parties. Complete relief may be accorded to
those already parties to the action without impairing or impeding the
absent names' ability to protect their interests and without subjecting
any party to multiple or otherwise inconsistent obligations. See
Fed.R.Civ.Proc. 19(a); Janney Montgomery Scott v. Shephard Niles, 11
F.3d 399 (3d Cir. 1993) (noting that joint and severally liable obligors
are
not necessary defendants under Rule 19(a)).

17. A duty to indemnify requires an insurer to pay on behalf of the
policyholder all sums that the insurer is contractually obligated to pay
as damages because of harms or losses covered by the policy. A duty to
defend obligates the insurer to pay the costs incurred preparing for and
defending a lawsuit brought against the policyholder. See General
Accident Ins. Co. v. State Dep't of Envtl. Protection (Fairclough), 672
A.2d
1154, 1155 (N.J. 1996).

20

The New Jersey Supreme Court addressed the appropriate characterization of government-mandated RI/FS costs in General Accident Ins. Co. v. State Dep't of Envtl. Protection (Fairclough), 672 A.2d 1154 (N.J. 1996).18 Fairclough, the insured, operated a fuel storage business. After an act of vandalism caused a discharge of approximately 1,300 gallons of fuel oil from Fairclough's facility, the New Jersey Department of Environmental Protection ordered Fairclough to conduct an RI/FS. Fairclough's insurer initially disputed its obligation to defend or indemnify Fairclough. However, it later entered into a consent order and agreed to indemnify Fairclough up to $100,000 and to defend claims related to the oil discharge until its indemnity limit was exhausted. After paying more than $100,000 in response costs, the insurer sought a declaration that it owed no further duty to Fairclough in connection with the oil discharge. The propriety of such a declaration required an allocation of the response costs between the insurer's defense and indemnity obligations.

The New Jersey Supreme Court declined to adopt a bright-line rule that all costs associated with a mandated RI/FS were either exclusively indemnity costs or exclusively defense costs. Rather the Court stated:

_____

18. The New Jersey Supreme Court decided General Accident in March 1996, after the District Court's 1993 judgment holding Aetna and the excess insurers liable "for the full amount of any and all costs of investigating and remediating" contamination at the Bridgeport terminal and three months before our first judgment in this case. Because the excess insurers did not specifically allege on appeal that the District Court's order erroneously required them to cover defense costs, Chemical Leaman contended on remand that the excess insurers had waived that challenge. The excess insurers countered that they had appealed their liability for defense costs in the form of appealing the joint and several liability component of the judgment. The District Court did not decide this waiver issue and instead properly determined that it was bound to revisit the issue in light of the intervening New Jersey Supreme Court decision. See 978 F.Supp. at 595. As this Court stated in Air Products and Chemicals, Inc. v. Hartford Accident & Indem. Co., 25 F.3d 177, 181 (3d Cir. 1994), "[w]e agree that a federal court exercising diversity jurisdiction is bound to follow the law as decided by the highest court of the state even if it has changed during the pendency of the federal action."

21

> [W]e believe the only fair result is a balanced solution that takes multiple factors into account. If it is clear that the expenditure clearly kills two birds with one stone in the sense of fulfilling a defense obligation while also relieving the policyholder of a potential claim for damages, the proper solution appears to be a fair allocation of the RI/FS costs between defense and indemnity provisions of the policy.

Id. at 1162. However, to avoid needless litigation in the form of a war of experts on the allocation issue, the New Jersey Supreme Court--as the District Court correctly noted--established a presumption that the costs of an RI/FS mandated by a government agency are indemnity costs. With respect to this presumption, the Supreme Court stated:

> We believe that there should be a presumption that mandated costs are indemnity costs to be allocated to the indemnity provisions of the policy. The burden should be on the policyholder to show that the insurance company has derived an unjust benefit from such an allocation to the extent that it has relieved the insurance company of an expense that it would otherwise have incurred under its obligation to defend.

Id.

On remand, the District Court interpreted this language in Fairclough to preclude an allocation of mandated RI/FS costs in part to defense costs unless "the insured shows that the allocation to indemnity alone would provide a windfall to its insurance company." 978 F.Supp. at 596 (emphasis added). Because Chemical Leaman did not contest, but in fact embraced, this presumption, the District Court ruled that all of Chemical Leaman's costs associated with the mandated RI/FS were indemnity costs. See id.

In so holding, however, the District Court failed to acknowledge an important distinction between Fairclough and the instant action. In Fairclough, the presumption that all costs associated with a government-mandated RI/FS are indemnity costs cut in favor of the insurer and against the policyholder. This is because Fairclough involved an insurer

22

with both a duty to indemnify and a duty to defend. To the extent that RI/FS costs were characterized as indemnity costs, these costs not only served to exhaust the policy limits, but also served to eliminate the insurer's duty to defend. In the instant case, the presumption operates in favor of the policyholder, Chemical Leaman, and against the excess insurers. To the extent that the costs associated with the mandated RI/FS are characterized as indemnity costs, the excess insurers are obliged to pay these amounts pursuant to their duty to indemnify. To the extent that the RI/FS costs are characterized as defense costs, the excess insurers are relieved of any obligation for these costs. Because Aetna paid no defense costs as part of its settlement with Chemical Leaman, Chemical Leaman must absorb any RI/FS costs characterized as defense costs.[19]

We do not agree that the New Jersey Supreme Court's decision in Fairclough established a presumption capable of being rebutted only by a policyholder without regard to who is actually aggrieved by such a presumption. Rather, we believe that Fairclough should be understood to stand for the proposition that a party disadvantaged by the presumption that the costs associated with a government-mandated RI/FS are indemnity costs is entitled to rebut that presumption. Thus, we hold that the District Court erred by precluding the excess insurers from rebutting the Fairclough presumption.

On appeal, Chemical Leaman does not seriously challenge this proposition. Rather, it argues that the excess insurers have proffered no evidence relevant to overcome the presumption. We disagree. In the context of the situation before us, financial responsibility is transferred from Chemical Leaman to the excess carriers and Chemical Leaman derives an unjust benefit whenever an expense that should be allocated to defense costs is instead allocated to indemnity. The record indicates that Chemical Leaman itself regarded as defense costs many of the expenses the District Court assigned to indemnity pursuant

_____

19. In the settlement agreement, Chemical Leaman and Aetna allocated the entire settlement payment of $11,500,000 to Chemical Leaman's indemnity claims under Aetna's 1959-1985 policies.

23

to the Fairclough presumption. When it asserted its claim for defense costs against Aetna, Chemical Leaman characterized numerous items of expense associated with the RI/FS as coming within Aetna's defense obligation. Additionally, the record contains the affidavit of an environmental consultant, Douglas J. Swanson, in which the various RI/FS costs associated with the Bridgewater contamination are classified as either defense costs or indemnity costs.[20] We view this affidavit as also providing some evidence tending to rebut the Fairclough presumption. We do not hold that the excess insurers have on this record rebutted the presumption. That is an issue better left to the District Court in the first instance. On remand, the District Court will also have discretion to determine whether the parties should have the opportunity to supplement the record now that the presumption has been held to be rebuttable by the excess insurers.

Additionally, we note that the New Jersey Supreme Court has not specified an exact method by which courts should attempt to accomplish a fair allocation once a fair allocation is deemed necessary. In Fairclough, the New Jersey Supreme Court merely stated that:

_____

20. Swanson classified these costs according to the following guidelines set forth in Endicott Johnson Corp. v. Liberty Mutual Ins. Co., 928 F.Supp. 176, 184 (N.D.N.Y. 1996), appeal dismissed, 116 F.3d 53 (2d Cir. 1997):

> To the extent that an expense is primarily attributable to remedial investigations--which address the sources and extent of the contamination, whether environmental damages can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site--the expense will be treated as a defense cost. To the extent an expense is primarily attributable to feasibility studies--which comprise plans for selecting and implementing the remediation alternative for the site--the expense will be treated as damages to be indemnified.

While the excess insurers encourage us to adopt Endicott Johnson's bright-line rule for allocating costs associated with a mandated RI/FS between defense and indemnity obligations, we decline to do so. Adoption of a rule that all costs associated with remedial investigations are defense costs and all costs associated with feasibility studies are indemnity costs would eviscerate Fairclough's starting point that all RI/FS costs are presumed to be indemnity costs.

24

> Such disputes seem ideally suited for mediation or
> arbitration under court-annexed programs of alternate
> dispute resolutions or on the parties' own initiative.
> Failing such resolution of the dispute in whole or in
> part, trial courts (upon recommendation of a master if
> one is appointed by the court) shall have broad
> discretion to resolve, based on written submissions
> without any additional expert testimony, a fair
> allocation of the costs between the defense and
> indemnity provisions of the policies.

Fairclough, 672 A.2d at 1162. The Court emphasized that it sought, not to simplify the substantive issues, which it recognized as intrinsically complex, but rather to "provide procedures to simplify their resolution." Id. at 1163. "An allocation that is swift, with perhaps a rough measure of justice, appears to us to be the best procedure to simplify resolution of these issues." Id. Nonetheless, the Court enumerated the following non-exclusive factors that it deemed relevant to any such "fair allocation" undertaken:

> (1) the relative risk that the [potentially responsible
> party] bore if it did not produce the RI/FS; for example,
> how realistic was the threat of treble damages; (2) the
> extent to which the details of the RI/FS may have been
> mandated by the environmental agencies; (3) the extent
> to which the RI/FS studies provide a means by which
> the insurance company or the policyholder would be
> relieved of or be able to mitigate potential claims for
> damages; and (4) the cost of producing the RI/FS in
> relation to the policy limits provided.

Id. at 1162.

Accordingly, we remand for a determination as to whether the excess insurers have sufficiently rebutted the Fairclough presumption, and, if necessary, for an allocation of the past and future costs associated with the government-mandated RI/FS between defense and indemnity costs with reference to the above enumerated factors and any other factor that the District Court deems relevant.

25

IV. SETTLEMENT CREDIT

We now turn to the issue raised by Chemical Leaman on appeal. Chemical Leaman challenges the District Court's holding that the excess insurers are entitled to a credit against their liability in this case of $11,055,000 based on Chemical Leaman's settlement with Aetna. The credit amount extended to the excess insurers determines at what point the excess insurers must begin covering Chemical Leaman's indemnity costs associated with Bridgeport. Chemical Leaman contends that the excess insurers should only receive a credit of $5,226,750, the amount of the settlement that Chemical Leaman and Aetna allocated to the Bridgeport site in their agreement.

In support of its argument, Chemical Leaman asserts that the limits set forth in Aetna's CGL policies are both per-occurrence and aggregate limits.[21] It is undisputed that Aetna's full per-occurrence policy limits applicable to Bridgeport total $11,055,000.[22] Because Chemical Leaman maintains that Aetna's policies contain aggregate limits equal to their per-occurrence limits, Chemical Leaman contends that allocation of the $11,055,000 among Chemical Leaman's various contamination sites is necessary. Moreover, Chemical Leaman claims that the excess insurers should be bound by Chemical Leaman's and Aetna's decision to allocate $5,226,720 to Bridgeport because they originally disclaimed coverage.

Chemical Leaman's arguments present at least three separate issues of New Jersey law: (1) whether in the event of a settlement between an insured and its primary insurer,

_____

21. Chemical Leaman put forth definitions of these types of limits that were subsequently adopted by the District Court. See 987 F.Supp. at 599 n12. A per-occurrence limit sets a maximum amount payable on a particular claim, but does not impact coverage available for other claims of the same type. An aggregate limit sets a cumulative amount of coverage for all claims of a particular type. See id.

22. Aetna provided total per-occurrence indemnity limits of $55,000 in the 1960 policy year; annual per-occurrence limits of $500,000 for policy years April 1, 1961, to April 1, 1979; and annual per-occurrence limits of $1,000,000 for policy years April 1, 1979, to April 1, 1981. See Appellee's Brief at 7.

excess insurers are entitled to a credit in the amount paid by the primary insurer or in the amount of the relevant policy limits; (2) whether, assuming (a) there are aggregate policy limits in the primary policies, (b) multiple covered sites have been contaminated, and (c) the insured and the primary insurer have allocated the settlement payment among the various covered sites, the court in thefirst suit to go to judgment should afford a full policy limit credit to the excess insurers or should limit the credit to the amount allocated in the settlement to the site(s) in that suit, leaving the excess insurers to assert the remaining credit in subsequent cases; and (3) whether the credit, whatever it is, should be offset against the total indemnity costs involved in the suit, or should first be allocated among the relevant policy years and then set off against the indemnity cost allocated to that year.

A. Settlement Amount v. Policy Limits

With respect to the first issue, the District Court predicted that the New Jersey Supreme Court would adopt the reasoning of UMC/Stamford, Inc. v. Allianz Underwriters Ins. Co., 637 A.2d 182 (N.J. Super. 1994), the one published New Jersey case on point. In UMC, the plaintiffs sought coverage for environmental pollution claims under various primary and excess insurance policies. After the plaintiff settled with primary insurers, a non-settling excess insurer moved for disclosure of the settlement amount. See id. at 190. Denying the motion, the UMC court reasoned that the excess insurer had no need to know the terms of the settlement. Instead, it ruled that "an excess carrier is entitled to a credit, not based on the primary carrier's settlement, but based on the amount allocable to the primary under its policies. In other words, the excess carrier is entitled to a credit for the full amount of the primary carrier's coverage before it is required to pay[under the excess policies.]" See id. (emphasis added).

As the District Court noted, the UMC approach tracks "a widely-followed corollary to the doctrine that a settlement with a primary insurer exhausts the primary coverage. Under this approach, the insured forfeits any right to coverage of any dollar difference between the settlement

27

amount and the primary insurer's policy limits. The excess insurer cannot be made liable for any part of this difference because the excess insurer never agreed to pay for losses below a specified floor (i.e. below the limits of the underlying policy)." 978 F.Supp. at 602 (internal citations omitted). This rule prevents the insured from securing a double recovery.

We do not disregard a decision of an intermediate appellate state court on an issue of controlling state law unless we are "convinced by other persuasive data that the highest court of the state would decide otherwise." See Pittston Co. v. Allianz Ins. Co., 124 F.3d 508, 516 (3d Cir. 1997) (quoting West v. American Telephone & Tel. Co., 311 U.S. 223, 237 (1940)). Here, we find no basis for predicting that the Supreme Court of New Jersey would decide otherwise. Accordingly, we hold that the excess insurers are entitled to a credit of $11,055,000, even though Chemical Leaman alleges that it received only $5,226,720 for its claims against Aetna regarding coverage at Bridgeport.

B. Full Credit v. Allocation on Basis of Settlement Agreement

We now turn to the issue raised by the fact that the primary and excess policies cover sites other than Bridgeport that have given rise to claims against Chemical Leaman and are the subject of other suits included within the Aetna settlement. Chemical Leaman acknowledges that if Aetna's policies contain only per-occurrence liability limits, as the excess insurers insist, no allocation of the settlement amount is required; the excess insurers are, in that event, entitled to a credit equal to Aetna's per-occurrence limits for each separate occurrence they are called upon to cover. Chemical Leaman argues, however, that Aetna's policies include an aggregate limit equal to the per-occurrence limit and therefore some account must be taken of the portion of settlement payment attributable to sites other than Bridgeport.

We find it unnecessary to decide whether the Aetna policies have aggregate policy limits. We assume, without deciding, that they do. Even making that assumption,

28

however, we conclude that where, as here, the primary and excess policies cover claims asserted against Chemical Leaman based on occurrences wherever they happen, 23 the Supreme Court of New Jersey would hold that the excess insurers are entitled to a credit equal to the total per-occurrence limits in the first suit to go to judgment. By granting the excess insurers in a particular year a credit in the amount of Aetna's per-occurrence policy limits for that year in the instant case, we do not prejudice Chemical Leaman or unduly benefit the excess insurers. Chemical Leaman may raise the issue of aggregate limits in subsequent litigation involving the liability of the excess insurers under the applicable policies.

The Supreme Court of New Jersey has repeatedly favored a pragmatic approach to issues of this kind, choosing the rule that will simplify resolution of disputes. See Owens-Illinois, 650 A.2d at 993 (seeking efficient and administratively simple allocation of liability among various insurers); Carter-Wallace, Inc. v. Admiral Ins. Co., 712 A.2d 1116, 1124 (N.J. 1998) (noting that the need for "efficient response" to the logistical challenge posed by environmental insurance litigation constituted factor relevant to allocation decisions). Even assuming that Aetna's policies contained aggregate limits, we believe the simplest and most straightforward approach is to extend the full credit amount to the excess insurers initially, rather than accepting Chemical Leaman's subjective allocation of this amount to the various contamination sites. If we were to hold that the excess insurers were only entitled to a credit amount of $5,226,750, the District Court would have to allocate this amount among the various policy years. Allocation of this amount in proportion to the amount of insurance purchased from Aetna in each policy year, while feasible, is unnecessarily complicating. It is much simpler to allow the excess insurers the full credit at Bridgeport rather than requiring allocation at each contamination site. Moreover, this solution eliminates the need for any court to pass on the fairness of Chemical Leaman's subjective allocation among the various contamination sites.

_____

23. The primary and excess policies cover the same occurrences; neither is site specific.

Finally, extension of the full credit to the first case against the excess insurers that goes to judgment or settles eliminates any chance of double recovery by an insured. If, for example, the total past and future indemnity costs associated with Bridgeport were $10,000,000, and we only extended a credit in the amount of $5,226,750 to the excess insurers, the excess insurers would be responsible for the difference of $4,773,250. Assuming further that the total damages to all other sites in the same policy years was less than $4,000,000, Chemical Leaman would have received a double recovery. Chemical Leaman would have received more in response costs from its insurers than it was required to pay out. While this may be a case in which the likelihood of overrecovery by the insured is remote, we believe the Supreme Court of New Jersey would be disinclined to adopt a rule that would entail a risk of overrecovery.

C. Credit Applied to Total Indemnity Costs v. Allocation Among Relevant Policy Years

While we affirm the District Court's determination that the excess insurers are entitled to a settlement credit of $11,055,000, we note that the District Court subtracted the entire settlement amount from $11,084,226, the total past indemnity costs for Bridgeport on the record at that time, and determined that the excess insurers would be liable for the difference plus all future indemnity costs. This wholesale cancellation of the credit did not respect the contractual rights of the excess insurers in the various policy years. For example, if these past costs were responsive entirely to soil contamination, then the excess insurers in the policy years 1960–1971 were the recipients of the entire $11,055,000 credit and the excess insurers in the policy years 1971–1981 were denied the benefit of any credit based on Aetna's underlying policy limits.

In order to respect their contractual rights, the excess insurers in a particular year should only begin covering Chemical Leaman's Bridgeport indemnity costs when the total costs allocated to that particular year exceed Aetna's policy limits for that year. Thus, on remand, the District Court should allocate the $11,055,000 settlement credit

30

according to Aetna's policy limits in each year. In order to determine when the costs in a particular year exceed Aetna's limits in that year, the District Court should (1) allocate all indemnity costs on the updated record as between soil, groundwater, and wetlands; (2) allocate the costs associated with each medium between the relevant policy years according to its Owens-Illinois calculations; and (3) calculate the total costs allocated to a particular year by adding the soil, groundwater, and wetlands costs for that particular year. For example, the excess insurers covering the policy year April 1, 1960, to April 1, 1961, should receive a credit in the amount of $55,000, Aetna's policy limit for that year. The excess insurers in that year should only pay for those indemnity costs allocated to that year when that amount exceeds $55,000.

V. ALLOCATION OF COSTS TO CHEMICAL LEAMAN
        BASED ON POLLUTION EXCLUSION

The excess insurers challenge the District Court's conclusion on remand that Chemical Leaman was not required to absorb a portion of its past and future indemnity costs related to soil and wetlands contamination at Bridgeport based on the liability-phase determinations that pollution exclusions in the 1971-1981 policies barred soil and wetlands coverage in those years. The District Court based its conclusion on a literal reading of this Court's prior opinion. Our opinion stated that we remanded for a reallocation "between the [excess] insurers and among the triggered [excess] policies." See 89 F.3d at 995. Our mandate stated that we remanded the instant case for reallocation of damages "among the applicable policies in accordance with the New Jersey Supreme Court's holding in Owens-Illinois." (JA99) The District Court interpreted our use of the term "triggered policies" as limiting allocation of all of Chemical Leaman's indemnity costs, beyond those covered by Aetna's policies, to those excess policies deemed liable in the District Court's previous order. See 978 F.Supp. at 603. Thus, the District Court concluded that we

31

had "ruled against any allocation back to the plaintiff insured on account of the pollution exclusion clauses." Id.24

The District Court's reading of our "triggered policy" language is understandable. Nevertheless, the question of whether Chemical Leaman was required to share in those costs was not before us, and we did not address it in our opinion. In this context, we believe the fair import of our mandate remanding for reallocation was simply to point out that an intervening New Jersey Supreme Court decision was controlling and therefore changed the damage allocation.

Having decided that our prior opinion does not preclude Chemical Leaman from absorbing a portion of its past and future indemnity costs related to soil and wetlands contamination at Bridgeport, we must decide whether requiring Chemical Leaman to bear such costs is appropriate under New Jersey law. We rely once again on Owens-Illinois.

As indicated previously, the Owens-Illinois Court held that in continuous trigger cases--situations where there is progressive, indivisible injury--damages should not be allocated among insurers under a theory of joint and several liability. Rather, the New Jersey Supreme Court held that "allocation should be in proportion to the degree of the risks transferred or retained [by the policyholder] during the years of exposure." 650 A.2d at 993 (emphasis added). To demonstrate how the necessary allocation should proceed and reflect periods of self-insurance, the Court offered the example of a company that was liable for continuous and indivisible damages spanning a nine-year period. The Court assumed that the company had purchased a constant level of insurance in years four, five,

_____

24. As noted above, the District Court deemed the past indemnity costs associated with Bridgeport to be covered by the $11,055,000 settlement credit and the excess amount properly allocated to groundwater. As a result, the District Court allocated only future soil and wetlands indemnity costs associated with Bridgeport to the excess insurers. The District Court allocated all future soil costs among the 1961 to 1971 policy years and all future wetlands costs among the 1961 to 1971 policy years.

and six of the damages period, but had purchased no insurance in the remaining years. Accepting the constant levels of the policy limits as evidence of constant risks over the nine-year period, the Court concluded that the carriers on the risk in years four, five, and six should each be responsible for one-ninth of the company's losses. See id. at 994.

While this hypothetical involved periods in which the company purchased no insurance, the Court nonetheless foresaw the exact issue raised on this appeal. Following this hypothetical, the Court noted that "of course, policy limits and exclusions must be taken into account." Id. (emphasis added). On this appeal, the excess insurers seek to have the damages to the soil and wetlands allocated, not only to those years when Chemical Leaman had coverage for its pollution damages, but also to those years when damages continued to occur as part of a continuous and indivisible process but for which coverage was barred due to an applicable pollution exclusion. The necessary effect of this reallocation would be to reduce the amount of damages allocated to each year in which the excess policies are liable for Chemical Leaman's damages.

Because the failure to purchase any insurance and an applicable policy exclusion both involve the retention of risk by the insured, we conclude, as suggested by the Owens-Illinois Court, that they should be treated similarly when allocating liability in accordance with Owens-Illinois and its progeny. This does not end our inquiry, however, for as the parties note, Owens-Illinois differentiates between a period of no insurance that reflects a choice to assume or retain a risk and a period of no insurance that reflects an inability to obtain coverage. The Owens-Illinois Court indicated that "[w]hen periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." Id. at 995. We interpret this statement to mean that if insurance was not available to Chemical Leaman to cover its pollution damages to the soil and wetlands after April 1, 1971, then Chemical Leaman should not be required to absorb part of its indemnity costs related to those two media. If, however,

33

insurance was available and Chemical Leaman chose not to purchase it, then Chemical Leaman should be required to shoulder part of those costs. On appeal, the parties disagree about whether the insured or the insurer should have the burden of proof on the availability of insurance.

While no published New Jersey case has reached this exact issue, the New Jersey Supreme Court has previously indicated its "inherent reluctance to place the burden of proving a negative fact on a litigant." Carter-Wallace, 712 A.2d at 1126. The Court has noted that, because of the difficulties associated with proving a negative, the burden of establishing the negative is "something the law rarely, if ever, imposes." Barbato v. Alsan Masonry & Concrete Inc, 318 A.2d 1, 10 n.2 (N.J. 1974). Thus, rather than require Chemical Leaman to prove that insurance was not available to cover its pollution damages to the soil and wetlands after 1971, we conclude that, under New Jersey law, the insurers should bear the burden of proving that insurance coverage was available.

If the excess insurers prove on remand that Chemical Leaman could have purchased insurance to cover its post-1971 damages to the soil and wetlands, Chemical Leaman should be required to absorb a portion of its past and future indemnity costs for those years in which those two media were damaged as part of a continuous and indivisible process but for which Chemical Leaman did not purchase available insurance. We will remand for the necessary factual finding on the availability of insurance, and, if necessary, for a reallocation of soil and wetlands damages. We note that the jury previously determined that damages occurred to the wetlands as part of a continuous and indivisible process between April 1, 1971, to April 1, 1978, and that no further damage occurred to the wetlands after April 1, 1978. However, because of the District Court's pre-trial ruling that the pollution exclusion in the 1971-1981 policies barred coverage for soil contamination, no factual findings have been made as to whether damage occurred to the soil as part of a continuous and indivisible process after April 1, 1971.25 We leave it to the District

_____

25. Because the contaminated rinse water passed through the soil before it reached the groundwater and because the jury found continuous and

34

Court's discretion, if allocation of damages to post-1971 years is found to be necessary, to determine the percentage of soil and wetlands damages to be absorbed by Chemical Leaman.

VI. CONCLUSION

On remand, the District Court should first determine whether the excess insurers have rebutted the Fairclough presumption. If so, it should allocate the cost associated with the government-mandated RI/FS between defense costs and indemnity costs. Second, the District Court should allocate all indemnity costs on the updated record as between soil, groundwater, and wetlands.

After determining the total past indemnity costs for each medium, the District Court should then allocate these costs among the applicable policy years for each medium. The excess insurers have not challenged the District Court's allocation of groundwater costs. However, they have challenged the District Court's holding that the excess insurers are responsible for the entire soil and wetlands indemnity costs. On remand, the District Court should determine whether insurance was available to Chemical Leaman to cover its post-1971 damages to the soil and wetlands. If insurance was available after 1971, then Chemical Leaman should be required to absorb a portion of its past and future indemnity costs for damage to the soil and wetlands that occurred after April 1, 1971, as part of the continuous and indivisible process of damage begun prior to that date.

Finally, the District Court should allocate the $11,055,000 credit amount such that the excess insurers in a particular policy year receive a credit in the amount of Aetna's policy limits for that year. Before the excess insurers of a particular policy year are to begin providing coverage, the total liability assigned to that policy year—the

_____

indivisible groundwater damages between 1971-1981, common sense suggests that the jury, if faced with the issue, would have found soil damage as part of a continuous and indivisible process between 1971-1981. However, we make no factual findings of our own on this issue.

sum of the soil, groundwater, and wetlands indemnity costs
--must exceed the limits of Aetna's policy limits in that
year.

The judgment of the District Court will be reversed, and
this matter will be remanded to the District Court for
further proceedings consistent with this opinion. Chemical
Leaman will bear the costs.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit